**E-FILED**
Friday, 29 February, 2008 03:17:20 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

**Jo Ann Agent, f/k/a Jo Ann Coats,**

        Plaintiff,

    v.

**Sears Logistics Services, Inc.,**

        Defendant.

No. 07-2113

Judge McCuskey
Magistrate Judge Bernthal

## DEFENDANT'S APPENDIX IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

David L. Christlieb, states as follows:

1.    I am one of the attorneys representing Defendant Sears Logistics Services, Inc.,

("Defendant"). I submit this Declaration and Appendix in support of Defendant's Motion for

Summary Judgment.

2.    The attached Appendix is submitted in support of Defendant's Motion and contains

true and correct copies of the following documents.

| | |
|---|---|
| Exhibit A | Deposition Transcript of Jo Ann Agent f/k/a Jo Ann Coats – taken on January 16, 2008 |
| Exhibit B | Deposition Exhibits of the deposition of Jo Ann Agent f/k/a Jo Ann Coats – Exhibits 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 21, 22 and 23 |
| Exhibit C | Declaration of Robin Batka |
| Exhibit D | Plaintiff's Workers Compensation Claim |

I verify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Respectfully submitted,

By:    /s/ David L. Christlieb

Adam C. Wit (06230538)
David L. Christlieb (06281173)

LITTLER MENDELSON
A Professional Corporation
200 N. LaSalle Street
Suite 2900
Chicago, IL 60601
Telephone: 312.372.5520
Facsimile: 312.372.7880

Dated:    February 29, 2008

***Attorneys for Defendant Sears Logistics Services, Inc***

## CERTIFICATE OF SERVICE

I hereby certify that on February 29, 2008, a copy of the foregoing ***Appendix in Support of Motion for Summary Judgment*** was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Michael L. Dietchweiler
LaBeau, Dietchweiler & Associates, P.C.
200 East Court St., Suite 700
Kankakee, IL 60901
(815) 933-9940 - Facsimile

on this 29th day of February, 2008.

/s/ David L. Christlieb
David L. Christlieb

Firmwide:84388452.1 016144.1200

E-FILED
Friday, 29 February, 2008  03:18:27 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT A

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                     January 16, 2008

Page 1

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

JO ANN AGENT, f/k/a      )
JO ANN COATS,            )
                         )
          Plaintiff,     )
                         ) No. 07-2113
     vs.                 )
                         ) Judge McCuskey
SEARS LOGISTICS SERVICE, ) Magistrate Judge Bernthal
INC.,                    )
                         )
          Defendant.     )

          The deposition of JO ANN AGENT, taken in the

above-entitled cause before Barbara J. Polke, C.S.R.,

Notary Public within and for the County of Cook and

State of Illinois, taken pursuant to the Federal Rules

of Civil Procedure for the United States District

Courts, at Suite 700, 200 East Court Street, Kankakee,

Illinois, on the 16th day of January, 2008, at the

hour of 9:14 a.m.

ff05bcad-f7ec-4366-8e3c-98a8396f380b

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                January 16, 2008

---

Page 2

APPEARANCES:

LaBEAU, DIETCHWEILER & ASSOCIATES, P.C.
200 East Court Street
Suite 700
Kankakee, Illinois 60901
(815) 933-6637
BY: MR. MICHAEL L. DIETCHWEILER,
    On behalf of the Plaintiff;

LITTLER MENDELSON, P.C.
200 North LaSalle Street
Suite 2900
Chicago, Illinois 60601
(312) 372-5520
BY: MR. DAVID L. CHRISTLIEB,
    On behalf of the Defendant;

ALSO PRESENT:

MS. ROBIN BATKA.

REPORTED BY: BARBARA J. POLKE, C.S.R.
    LICENSE NO. 084-002486

---

Page 3

### INDEX

| WITNESS | EXAMINATION |
|---|---|
| JO ANN AGENT | |
| By Mr. Christlieb | 6 |

### EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Agent Deposition Exhibit | |
| No. 1 | 12 |
| No. 2 | 20 |
| No. 3 | 21 |
| No. 4 | 24 |
| No. 5 | 29 |
| No. 6 | 42 |
| No. 7 | 44 |
| No. 8 | 48 |
| No. 9 | 51 |
| No. 10 | 55 |

---

Page 4

### EXHIBITS(Continued)

| NUMBER | MARKED FOR ID |
|---|---|
| Agent Deposition Exhibit | |
| Group No. 11 | 60 |
| Group No. 12 | 64 |
| No. 13 | 77 |
| Group No. 14 | 77 |
| No. 15 | 81 |
| No. 16 | 89 |
| No. 17 | 93 |
| No. 18 | 95 |
| No. 19 | 96 |
| No. 20 | 99 |
| No. 21 | 100 |
| No. 22 | 101 |
| No. 23 | 102 |
| No. 24 | 104 |

---

Page 5

1    (Witness duly sworn.)
2    MR. CHRISTLIEB: Good morning, ma'am. My name is
3    David Christlieb. I am an attorney with a law firm
4    called Littler Mendelson, and we represent Sears in
5    the lawsuit you have brought against them.
6        Have you ever had your deposition taken
7    before?
8    THE WITNESS: No.
9    MR. CHRISTLIEB: Okay. The way it works is just
10   a pretty simple question-and-answer format. I will
11   ask you a series of questions. If at any point you
12   don't understand my question or I have been unclear in
13   any way, please let me know, and I will try to
14   rephrase it, say it again, do whatever I need to do to
15   make sure you understand the question.
16       If you don't say anything, I am going to
17   presume you understand. Is that okay?
18   THE WITNESS: Yes.
19   MR. CHRISTLIEB: All right. And if you need a
20   break at any time, please ask. If a question is
21   pending, I will ask that you answer the question
22   before you break; but if one isn't, we will break
23   immediately for any reason. Whatever you need to do,
24   just ask.

---

ff05bcad-f7ec-4366-8e3c-98a8396f380b

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                January 16, 2008

---

**Page 6**

1          Another rule for depositions is that you
2    have to answer verbally.  You can't nod your head or
3    shake your head, because, obviously, the court
4    reporter can't pick that up.
5              JO ANN AGENT,
6    called as a witness herein, having been first duly
7    sworn, was examined and testified as follows:
8              EXAMINATION
9    BY MR. CHRISTLIEB:
10      Q.  Do you understand that you are under oath
11   and must answer truthfully today?
12      A.  Yes.
13      Q.  Okay.  Are you currently taking any kind of
14   medication or drug which would prevent you from
15   testifying competently or truthfully today?
16      A.  I am on an antibiotic.
17      Q.  Okay.  But do you think that antibiotic
18   would keep you from testifying competently or
19   truthfully today?
20      A.  I don't think so.
21      Q.  Okay.  Is there any other reason we
22   shouldn't proceed with your deposition today?
23      A.  Not that I know of.
24      Q.  Okay.  Let me ask, and, to be clear, I'm not

---

**Page 7**

1    asking you about anything you and your attorney
2    discussed, but I would like to know what you did to
3    prepare for your deposition today.
4       A.  Got dressed, came here.
5       Q.  Okay.  Did you review any documents?
6       A.  No.
7       Q.  Okay.  Have you discussed your deposition
8    with anyone other than your attorney?
9       A.  No.
10      Q.  All right.  On the Complaint in this case,
11   it refers to you as Jo Ann Agent, f/k/a Jo Ann Coats.
12   Which do you go by now?
13      A.  Agent.
14      Q.  Agent, okay.  Is that your legal name,
15   Jo Ann Agent?
16      A.  I just recently got divorced.  I can go back
17   to my Coats, because I asked to go back to Coats.  So
18   right now, yes, legally, I am Jo Ann Agent.
19      Q.  What's your current address?
20      A.  350 North Birch, Apartment 4, Manteno,
21   Illinois.
22      Q.  How long have you lived there?
23      A.  A year and a half, I think.
24      Q.  Okay.

---

**Page 8**

1       A.  It will be two years in August.
2       Q.  Okay.  What's your highest level of
3    education?
4       A.  My GED.
5       Q.  Okay.  About what year did you receive your
6    GED?
7       A.  '83, '84.  I'm not quite sure.
8       Q.  All right.  Do you have any military
9    service?
10      A.  No.
11      Q.  Okay.  And you mentioned you were just
12   recently divorced?
13      A.  Yes.
14      Q.  When were you divorced?
15      A.  That's real important.  You know, let me
16   think.  Oh, my gosh.  I don't remember.  I know it was
17   this year.
18      Q.  This year?
19      A.  Or last year.
20      Q.  In 2007?
21      A.  Yes.
22      Q.  What's your ex-husband's name?
23      A.  Eddie Agent.
24      Q.  All right.  Do you have any children?

---

**Page 9**

1       A.  Yes.
2       Q.  And what are their names?
3       A.  Dakota and Dolton.
4       Q.  How old are they?
5       A.  Dakota is 15.  Dolton is 11.
6       Q.  Okay.  Have you ever been convicted of a
7    crime?
8       A.  Like, what do you mean?
9       Q.  A crime; not, like, a traffic ticket or
10   anything.  Have you ever had to go to court in a
11   criminal matter involving yourself?
12      A.  Yes.
13      Q.  What was that about?
14      A.  A misdemeanor battery.
15      Q.  And when was that?
16      A.  I want to say it was April of last year.
17      Q.  And who were you accused of having battered?
18      A.  My husband's ex-wife.
19      Q.  And what's her name?
20      A.  Rebecca Agent.
21      Q.  And how did that turn out?  Were you
22   convicted?
23      A.  No.  I pleaded guilty.
24      Q.  And what was the result of that?  Did you

---

3  (Pages 6 to 9)

ff05bcad-f7ec-4366-8e3c-98a8396f380b

AGENT vs. SEARS LOGISTICS SERVICE, INC.

DEPOSITION OF JO ANN AGENT                              January 16, 2008

Page 10

1   get probation, jail time?  What happened?
2       A.  I got court supervision for one year.  It
3   might have been six months.  I'm not -- I don't
4   remember.
5       Q.  Is it your understanding that you are still
6   under court supervision?
7       A.  It's possible.
8       Q.  Okay.  Anything else other than the
9   misdemeanor battery in 2007?
10      A.  Not that I remember.
11      Q.  Okay.  Have you ever been a party to a
12  lawsuit before?
13      A.  What do you mean?
14      Q.  Have you ever sued anyone else before?
15      A.  You mean, like, workman's comp?
16      Q.  Yes, other than Sears.
17      A.  Years ago, Alexander Construction.
18      Q.  Okay.  And that was a workman's comp matter?
19      A.  Oh, no, it wasn't.  He rear-ended me.
20      Q.  Who rear-ended you?
21      A.  Alexander Construction.
22      Q.  Was it Mr. Alexander that rear-ended you?
23      A.  No.  It was a gentleman that was up for,
24  like, three days and wasn't paying attention, one of

Page 11

1   his employees.
2       Q.  And when was that, what year?  Was it in
3   2005?
4       A.  No.  That was probably I want to say maybe
5   10 or 15 years ago.
6       Q.  Okay.  What were your injuries from that car
7   accident?
8       A.  Pulled muscle.
9       Q.  Where did you pull a muscle?
10      A.  My neck.
11      Q.  Did you undergo treatment for that pulled
12  muscle in your neck?
13      A.  Yes.
14      Q.  For how long?
15      A.  Maybe a month, 2 months, 3 months.  I don't
16  know.  It's been a long time.
17      Q.  And did you continue to have problems with
18  the pulled muscle in your neck after those 1 to
19  3 months or was it --
20      A.  No.
21      Q.  Do you recall what was your last name at
22  that time?
23      A.  Coats.
24      Q.  And where was the lawsuit?  Do you recall

Page 12

1   what court?
2       A.  Kankakee.
3       MR. CHRISTLIEB:  All right.  Mark that No. 1.
4           (Whereupon Agent Deposition
5            Exhibit No. 1 was marked for
6            identification.)
7   BY MR. CHRISTLIEB:
8       Q.  Ms. Agent, I have handed you a document
9   that's marked Exhibit No. 1, and on the back side of
10  that document it lists prior employment.  First of
11  all, to begin, do you recognize this document?
12      A.  Yes.
13      Q.  And is this your application to Sears?
14      A.  I would assume.
15      Q.  And on the back of the document, it lists
16  Empress Casino, Lambrecht -- T.S. Lambrecht
17  Construction, Designer Crafts & Supplies, Rock Tenn
18  Corp., and --
19      A.  Ivex.
20      Q.  -- Ivex Corp.  Were those all of the
21  employers you had prior to Sears?
22      A.  To my knowledge, that I can remember.
23      Q.  And does this accurately set out your
24  employment history prior to working at Sears?

Page 13

1       A.  Yes.
2       Q.  Now, we've talked about your employment
3   prior to Sears.  I would like to talk just a bit about
4   your employment after you worked at Sears.
5           In your Answers to Interrogatories, you said
6   that you worked for a company called Parsec from
7   August 2006 to December of 2006.  Is that correct?
8       A.  Yes.
9       Q.  What does Parsec do?
10      A.  They are a rail yard.
11      Q.  And what was your job there?
12      A.  Spotter.
13      Q.  And what does a spotter do at Parsec?
14      A.  Back up -- or pull trailers from the tracks
15  and put them away or bringing them down, the chassis,
16  down to the rail yard or the railway tracks.
17      Q.  Anything else?
18      A.  Backing them up.  I was also trained as a
19  racker.
20      Q.  What does a racker do?
21      A.  You take the chassis and stack them up.
22      Q.  First of all, what's a chassis?
23      A.  What the containers come on off the trains.
24  They have to put them on something with wheels.

ff05bcad-f7ec-4366-8e3c-98a8396f380b

**Page 14**

1    Q.  Okay.  And do you physically do that or do
2  you use a machine to do that?
3    A.  A truck.
4    Q.  A truck?  Like, a forklift?
5    A.  No, a spotter truck.
6    Q.  What's a spotter truck?
7    A.  It's a truck with a fifth wheel that allows
8  you to get underneath the semis to pull them from one
9  spot to another spot.
10    Q.  Were you physically able to fulfill your job
11  duties at Parsec?
12    A.  Yes.
13    Q.  Did you have to take a physical before you
14  worked there?
15    A.  Yes.
16    Q.  Did you pass it?
17    A.  Yes.
18    Q.  I understand as of the end of December of
19  2006, you were no longer employed at Parsec.  Correct?
20    A.  Yes.
21    Q.  What happened?  Why did you leave that job?
22    A.  I was laid off, a massive layoff.
23    Q.  The company had a massive layoff.  Is that
24  correct?

**Page 15**

1    A.  Uh-huh, yes.
2    Q.  And I understand you're employed currently.
3  Correct?
4    A.  No.  I'm laid off now.
5    Q.  When were you laid off?
6    A.  December 24th, '07.
7    Q.  And where were you working prior to that?
8    A.  Prior to?
9    Q.  Prior to being laid off on December 24th,
10  '07, where were you laid off from?
11    A.  UPS.
12    Q.  And what were you doing for UPS?
13    A.  Driving.
14    Q.  Driving a package car?
15    A.  Yes.
16    Q.  When were you hired by UPS?
17    A.  October 31st, approximately.  No.  It might
18  have been before that.  It was that Monday, so it
19  would be, like, the 28th, 29th.
20    Q.  End of October 2007?
21    A.  Yes.
22    Q.  And were you hired as a package car driver?
23    A.  Yes, seasonal.
24    Q.  So did you understand, when you were hired

**Page 16**

1  in October of 2007, that you would only be employed
2  seasonally?  You wouldn't have a permanent job?
3    A.  Yes.  That's what they said.  That's their
4  way of doing it, and then you get called back.
5    Q.  Will you be -- do you understand that you
6  will be called back?
7    A.  I'm under the understanding, yes, because
8  I've already talked to them.
9    Q.  When do you think you will be called back?
10    A.  Hopefully, within the next week.
11    Q.  Did you drive a package car every day, or
12  did you work as a loader some days?
13    A.  Always a driver.  Oh, wait a minute.  I was
14  a helper a couple times for other drivers.
15    Q.  And what are your duties as a package car
16  driver?
17    A.  Deliver packages to whatever address they
18  tell me to go to.
19    Q.  Did you have a regular route or did you fill
20  in for folks at that time?
21    A.  A regular route.  It was to the Orland
22  Square Mall.
23    Q.  And that job required you to carry packages.
24  Correct?

**Page 17**

1    A.  Yes.
2    Q.  What's the weight limit on packages at UPS
3  that you would be carrying?
4    A.  It could range from, I don't know, 2 ounces
5  to probably 100 pounds.
6    Q.  And were you able to carry 100-pound
7  packages?
8    A.  Without -- well, I had to have help.
9    Q.  Who helped you?
10    A.  Another driver, if they were there; one of
11  the employees that worked at the places we were
12  delivering.  They would send their stockers out.
13    Q.  Are you able to carry 50-pound packages on
14  your own?
15    A.  Probably.
16    Q.  What's your rate of pay at UPS?
17    A.  It was 14.70, I think.
18    Q.  And do you get benefits?
19    A.  No.
20    Q.  No health insurance or anything?
21    A.  Nothing.
22    Q.  Are you a Teamster, a member of the
23  Teamster's union?
24    A.  They took the dues out.  I don't know if I

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

| Page 18 | Page 20 |
|---|---|

Page 18

1 was -- I mean they told me if I had any problems, I
2 could go to them.
3     Q. What kind of hours were you working at UPS?
4     A. 8:40 to it would be 4:00, but with the
5 seasonal -- when the season came in, it was, like,
6 7:00 o'clock. I couldn't work no more than 12 hours.
7     Q. Are you paid time and a half for overtime?
8     A. After 8, yes.
9     Q. Did you have to take a physical for your job
10 at UPS?
11     A. Yes.
12     Q. And you passed. Correct?
13     A. Yes.
14     Q. You said you're currently on antibiotics.
15 What's that for?
16     A. I have a chest cold.
17     Q. Are you currently under a doctor's care for
18 any other reason?
19     A. No.
20     Q. Do you have any physical limitations in your
21 day-to-day activities?
22     A. No.
23     Q. Going back to 1998 when you were hired by
24 Sears, how did you hear of the position?

Page 19

1     A. I want to say maybe the newspaper or --
2 that's what I'm assuming.
3     Q. And what position did you apply for, do you
4 remember?
5     A. Anything.
6     Q. Did you know anyone who worked there?
7     A. No.
8     Q. Did you have an interview before you were
9 hired?
10     A. Yes.
11     Q. Do you remember with whom?
12     A. No.
13     Q. If I said you were hired on September 9th,
14 1998, does that sound correct?
15     A. Yes.
16     Q. And what job were you hired into?
17     A. Unloader.
18     Q. And what were you unloading?
19     A. Merchandise off the trailers.
20     Q. What's your understanding of what Sears did
21 there at that location? What did the business do?
22     A. They supplied stores, filled orders for
23 stores.
24     Q. So trucks would come in with product. They

Page 20

1 would be unloaded into the warehouse, and then Sears
2 would supply stores from that warehouse. Is that your
3 understanding?
4     A. Yes.
5     Q. Do you recall who hired you?
6     A. No.
7     Q. Did you receive a copy of an employee
8 handbook at Sears?
9     A. It's possible.
10     Q. You don't recall?
11     A. Through orientation maybe, years ago.
12     MR. CHRISTLIEB: Let's mark that 2, please.
13         (Whereupon Agent Deposition
14         Exhibit No. 2 was marked for
15         identification.)
16 BY MR. CHRISTLIEB:
17     Q. Showing you what's been marked as Exhibit
18 No. 2, at the top it says, "Acknowledgment of Receipt
19 of Associate Handbook." Is that your signature at the
20 bottom?
21     A. Uh-huh.
22     Q. Is that a yes?
23     A. Yes. I'm sorry.
24     Q. Does this document refresh your recollection

Page 21

1 as to whether you would have received an employee
2 handbook on or about August of 2000?
3     A. Yes, two years after I was employed.
4     Q. Okay. Do you remember receiving that
5 employee handbook?
6     A. We probably went through it.
7     MR. CHRISTLIEB: Okay. No. 3.
8         (Whereupon Agent Deposition
9         Exhibit No. 3 was marked for
10         identification.)
11 BY MR. CHRISTLIEB:
12     Q. This document that's been placed in front of
13 you, Exhibit No. 3, is that also your signature at the
14 bottom?
15     A. Yes.
16     Q. Do you recall, on or about July of '03,
17 receiving changes to the associate handbook?
18     A. I guess.
19     Q. And you read and signed this document.
20 Correct?
21     A. Yes. That's my signature.
22     Q. What job did you have at Sears after you
23 worked as an unloader? What was your next position at
24 Sears?

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

ff05bcad-f7ec-4366-8e3c-98a8396f380b

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

| Page 22 | Page 24 |
|---|---|

**Page 22**

1    A.   Spotter.
2    Q.   When did you become a spotter?
3    A.   Let's see.  2002 I think it might have been.
4  No. It might have been -- it was either 2001 or 2002.
5  I don't know.  It was one of them.
6    Q.   2001 or 2002.  Correct?
7    A.   Approximately.
8    Q.   Was that a promotion?
9    A.   No.  It was a job opening.
10    Q.   But it was a job opening that you wanted?
11    A.   Yes.
12    Q.   You wanted to become a spotter.  Correct?
13    A.   Yes.
14    Q.   Was there higher pay?
15    A.   Yes.
16    Q.   Did you have to post for the job?
17    A.   I had to qualify for it.
18    Q.   How do you qualify for it?
19    A.   I had to take a test, backing a semi in.
20    Q.   And I take it you passed that test?
21    A.   Yes.
22    Q.   Was there anything else you had to do to
23  qualify?
24    A.   Not to my knowledge.

**Page 23**

1    Q.   Okay.  Did you have to interview?
2    A.   Yes.
3    Q.   Who did you interview with?
4    A.   John Macaluso.
5    Q.   Do you know how to spell that last name?
6    A.   No, I don't.  I think it's M-a- -- I don't
7  know.
8    Q.   Okay.  What was his position?
9    A.   He was supervisor.
10    Q.   Do you know if other people applied for the
11  spotter position at that time?
12    A.   Not to my knowledge.
13    Q.   What does a spotter do?
14    A.   Takes a semi from one door to another door,
15  backs it in, closes the door when it's finished, put a
16  seal on it, and get it ready to go outbound; or, if
17  it's coming inbound, you take it from the inbound side
18  and put it in the receiving door.
19    Q.   So you use a truck to move semitrailers
20  around from one bay to another?
21    A.   Yes.
22    Q.   And when you said "closes the door," do you
23  have to do that yourself, physically?
24    A.   Uh-huh, yes.

**Page 24**

1    Q.   Are the doors heavy?
2    A.   They can be.
3    Q.   But you were able to open and close them, as
4  a spotter?
5    A.   Yes.  There was times when I needed help.
6    Q.   When you were a spotter, is that position
7  also known as a tractor operator, to your knowledge?
8  Is that the same thing?
9    A.   Well, yard jockey.  They call them yard
10  jockeys.  I'm not sure if they call it that.
11    Q.   Okay.
12    A.   Tractor driver, is that what you just said?
13    Q.   Tractor operator.
14    A.   It's possible.
15    MR. CHRISTLIEB:  4, please.
16        (Whereupon Agent Deposition
17        Exhibit No. 4 was marked for
18        identification.)
19  BY MR. CHRISTLIEB:
20    Q.   The document that's been put in front of you
21  labeled Exhibit No. 4 is titled, "Logistics Services
22  Position Description, Tractor Operator."  It says the
23  job purpose is, "....responsible for driving of
24  gasoline and/or diesel-powered tractors to and from

**Page 25**

1  warehouse dock doors...."  Does this describe, and
2  then I'll give you time to look at it, does this
3  describe the job you were performing that we just
4  talked about as a spotter?
5    A.   Yes.
6    Q.   Is there anything you would add or take away
7  from the job responsibilities listed on this document?
8    A.   No.
9    Q.   Okay.  And as of the end of 2004, you were
10  able to fulfill all of these duties.  Correct?
11    A.   Yes.  Well, except for -- the job, down
12  here, the job comp --
13    Q.   The job competencies?
14    A.   Yes, that's it.  You didn't have to have
15  your CDL back then.
16    Q.   You did not have to have your CDL?
17    A.   No.
18    Q.   Anything else?
19    A.   Not that I know of.
20    Q.   And you did not have your CDL?
21    A.   No.
22    Q.   Okay.  So other than "Maintain current CDL,"
23  you were able to fulfill all of these responsibilities
24  as of the end of 2004.  Correct?

7  (Pages 22 to 25)

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

| Page 26 | Page 28 |
|---|---|

**Page 26**

1    A.  Yes.
2    Q.  Now, in Sears business fulfilling orders for
3  stores, there is a seasonal buildup.  Correct?
4    A.  Yes.
5    Q.  And you're familiar then that Sears would
6  hire a lot of people before the holiday season and let
7  them go in or around December.  Correct?
8    A.  If they didn't do their jobs, I guess.
9    Q.  If --
10   A.  If they didn't fulfill their job.  You know
11  what I'm saying?  Because -- you know, what, yes.
12  That's fine.
13   Q.  I guess what I'm asking is they hired a lot
14  of seasonal people.  Correct?
15   A.  I don't know.  I wasn't seasonal, so I would
16  never listen to that.  I was outside.
17   Q.  Okay.  So you don't recall whether or not
18  Sears would hire a bunch of seasonal people every
19  year?
20   A.  For extra help, I'm sure they did, but I
21  wasn't seasonal.
22   Q.  Okay.  Was there a time during the year
23  where outside, you were busier than the rest of the
24  year?

**Page 27**

1    A.  Yes.
2    Q.  And when was that?
3    A.  Christmas season.
4    Q.  And when would that ramp up?  When would you
5  become more busy?
6    A.  Oh, maybe October, maybe October.
7    Q.  And when would that end, the busier season?
8    A.  I don't know.  I mean we always pretty
9  much -- you know what, I don't know.
10   Q.  You don't recall?
11   A.  No.
12   Q.  In 2004, were you familiar with Robin Batka?
13   A.  Yes.
14   Q.  Do you remember her position?
15   A.  Yes.
16   Q.  What was her position?
17   A.  Human resources.
18   Q.  And how did you know her?
19   A.  She was in the office.
20   Q.  Did you have occasion to deal with her on a
21  day-to-day basis?
22   A.  No.
23   Q.  How often would you speak with her?
24   A.  Whenever I had a question or --

**Page 28**

1    Q.  Did you have a good relationship, a friendly
2  relationship?
3    A.  Yes.
4    Q.  Did you have any personal conflicts with her
5  at all?
6    A.  No.
7    Q.  What about Dan Usrey, did you know Dan?
8    A.  Not personally.
9    Q.  What was his position?
10   A.  He was the top guy, above Robin.
11   Q.  Does general manager ring a bell?
12   A.  Yes.
13   Q.  He was the general manager then?
14   A.  I believe so.
15   Q.  Okay.  Did you ever speak to him personally?
16   A.  Yes.
17   Q.  What about?
18   A.  I was on the safety committee, and we would
19  have meetings, and we all would sit together and
20  discuss things.
21   Q.  Did you ever talk to him about issues with
22  you personally at Sears?
23   A.  Me personally?  No.
24   Q.  Do you know someone named Don McArthur?

**Page 29**

1    A.  Not to my knowledge.
2    MR. CHRISTLIEB:  Off the record for a second.
3        (Discussion off the record.)
4        (Whereupon Agent Deposition
5        Exhibit No. 5 was marked for
6        identification.)
7  BY MR. CHRISTLIEB:
8    Q.  I have placed in front of you -- it's a few
9  pages long, but I have had it marked as Exhibit 5.
10  The first page says "Action Plan II," and it lists
11  your name.  Is that your signature towards the bottom
12  third of the page?
13   A.  On the first page?
14   Q.  Yes.
15   A.  Yes.
16   Q.  Do you recognize this document?
17   A.  Yes.
18   Q.  Okay.  What is an Action Plan II?
19   A.  Just to let you know that you're getting
20  close to your occurrences running out.
21   Q.  Attendance occurrences?
22   A.  Yes.
23   Q.  What happens when your attendance
24  occurrences run out?

8  (Pages 26 to 29)

ff05bcad-f7ec-4366-8e3c-98a8396f380b

Page 30

1     A. You get put on an action plan.
2     Q. And here it says you're on Action Plan II,
3 and if you flip back one page, it says "Action
4 Plan I." Correct?
5     A. Yes.
6     Q. Okay. So you were put on -- well, flip back
7 one more page. It says "Coaching Interview."
8 Correct?
9     A. Yes.
10    Q. Okay. And is that your signature on all
11 three of these first three pages?
12    A. I do believe so.
13    Q. Okay. So on or about 8/16/04, you had a
14 coaching interview regarding absenteeism. Correct?
15    A. Yes.
16    Q. And then on or about November 17, '04, you
17 were put on an Action Plan I regarding absenteeism.
18 Correct?
19    A. Yes.
20    Q. And then on December 27th, 2004, you were
21 put on Action Plan II for absenteeism. Correct?
22    A. Yep. Yes.
23    Q. Okay. Is there an Action Plan III?
24    A. I don't know. I don't usually get that far.

Page 31

1     Q. Okay. Do you know what happens if you
2 continue to miss days after you go on Action Plan II?
3     A. No.
4     Q. You didn't know or you don't know currently?
5     A. You know, it's been a while.
6     Q. And so you don't recall what happens if you
7 continue to have absenteeism problems after you are on
8 Action Plan II?
9     A. You get fired.
10    Q. Do you think that's what happens?
11    A. If I go -- I guess. I don't know.
12    Q. Okay. Did you have action plans for -- were
13 you put on action plans for absenteeism prior to 2004?
14    A. Yes.
15    Q. And if I said -- well, do you recall how
16 many times you were put on action plans prior to 2004?
17    A. No.
18    Q. If I said you were put on Action Plan II for
19 absenteeism every year of your employment prior to
20 2004, do you recall whether that's true or not?
21    A. That's possible.
22    Q. On or about January 2nd, 2005, you had an
23 accident at work. Correct?
24    A. Yes.

Page 32

1     Q. What happened on that day? What happened in
2 the accident?
3     A. I was driving my spotter truck. We were
4 pretty much being pushed to get our work done and get
5 them in.
6        There was -- I couldn't go the one area that
7 I usually go because trucks were blocking the road,
8 and I was driving, and I went through all the potholes
9 the size of craters, and my truck bounced all over,
10 and it flung me around.
11    Q. How fast were you going? Is there a
12 speedometer on those trucks or no?
13    A. I do believe there is.
14    Q. Do you recall how fast you were going?
15    A. The speed limit.
16    Q. What was the speed limit?
17    A. That, I'm not sure.
18    Q. But you recall you were going the speed
19 limit?
20    A. Yes. I wasn't -- I don't go over it.
21    Q. Okay.
22    A. I mean I doubt if I reached the speed limit,
23 but I know I wasn't going above it.
24    Q. Okay. Do you recall about what the speed

Page 33

1 limit was?
2     A. No.
3     Q. Was it 10 miles an hour, more than 10 miles
4 an hour?
5     A. You know, I'm not sure if they even had a
6 speed limit posted.
7     Q. Okay.
8     A. I know they always said no more than, like,
9 15, 20 is what they had verbally spoken, I do believe.
10    Q. So you weren't going more than 15 or 20
11 miles an hour?
12    A. No, you can't, not in the yard.
13    Q. Okay. And you hit some potholes. Do you
14 recall how deep they were, if you had to estimate?
15    A. (Indicating) probably about, jeez, I don't
16 know, maybe eight inches deep. They might have been
17 deeper. They were pretty deep.
18    Q. You said that was in an area you didn't
19 normally drive through. Correct?
20    A. You tried to avoid it, unless it was
21 necessary.
22    Q. Did you try to avoid it because you knew of
23 the potholes, or was there another reason to try to
24 avoid it?

Page 34

1    A.  Well, I went that way because the roads were
2    blocked.
3    Q.  Right, but why did you normally try to avoid
4    that area?
5    A.  Because there's a lot of traffic on that
6    side also.
7    Q.  Did you also know there were potholes in
8    that area?
9    A.  Yes.
10   Q.  Yes?
11   A.  Yes.  There were holes all over the yard.
12   Q.  Had you driven over those potholes before?
13   A.  Very slowly.
14   Q.  But this time, you drove over them more
15   quickly?
16   A.  Actually, I guess.  You know, it's been a
17   while.
18   Q.  So you're not sure whether you drove over
19   them slowly or quickly?  You don't remember?
20   A.  No.  Alls I know, it was, obviously, fast
21   enough to probably damage the truck, too.
22   Q.  Did it damage the truck, do you remember?
23   A.  No.  I don't think so.
24   Q.  Okay.  And you said you were flung around

Page 35

1    inside the truck.  Was there a seat belt in the truck?
2    A.  Yes.
3    Q.  Were you wearing it?
4    A.  Yes; otherwise, we would get wrote up for it
5    if we didn't.
6    Q.  Okay.  Did the seat belt hold you in your
7    seat or --
8    A.  It held me in the seat.
9    Q.  It did?
10   A.  Well, we have air seats, so whenever you hit
11   anything, they bounce up and down.
12   Q.  So the seat itself bounced up and down?
13   A.  Uh-huh.
14   Q.  Yes?
15   A.  Yes.
16   Q.  About what time did that happen?
17   A.  I don't recall.  It was before my shift
18   ended.
19   Q.  Was it toward the end of the shift?
20   A.  Yes.
21   Q.  Did it hurt when it happened?
22   A.  Yes.  It -- yes, it did.  Well, I mean, you
23   know, kind of.  You know what I'm saying?  When it
24   happened, it just, like, a hot thing went down my

Page 36

1    neck.
2    Q.  You felt heat?
3    A.  Yes.
4    Q.  But not pain?
5    A.  No.  There was pain.  It was, like, a
6    sharp stabbing, and then I just wanted to get off
7    work, so --
8    Q.  You wanted to get off work?
9    A.  No.  I wanted to -- my time was up.  My
10   eight hours was up.
11   Q.  So it was right at the end of your shift?
12   A.  Right.
13   Q.  Did you believe you were injured at that
14   time?
15   A.  I knew something was wrong, but I just
16   figured if I took maybe a Tylenol, it would go away.
17   Q.  Did you report that day that you had had an
18   accident?
19   A.  The next morning, I did.
20   Q.  Why didn't you report it that day?
21   A.  I didn't think it would be something major.
22   Q.  You didn't think it was something major the
23   day it happened?
24   A.  No, I didn't.  I don't know.  I mean I

Page 37

1    wasn't -- not to this extreme.  Do you see what I'm
2    saying?
3    Q.  Well, did you believe you had had an
4    accident?
5    A.  Uh-huh.  Yes, I knew I had an accident.
6    Q.  Are you supposed to report accidents?
7    A.  Within a time line.  You have a time line.
8    I think it was within 24 hours you have to or within
9    the week.  I'm not sure.  If I could view a handbook
10   or something --
11   Q.  At the end of your shift that day, did you
12   plan to report an accident?  Were you thinking to
13   yourself I'm going to report this accident tomorrow?
14   A.  Personally, I really didn't want to, because
15   I listen to our safety meetings and how they make fun
16   of people when somebody has an accident, and I didn't
17   really want to be one of them.
18   Q.  When did you have these safety meetings?
19   A.  Like, once a month.
20   Q.  Who led the safety meetings?
21   A.  Dan Usrey sometimes joined in.  Jeez, I
22   can't remember.  It was everybody -- different people
23   from different departments.
24   Q.  And who was involved in the safety meetings?

ff05bcad-f7ec-4366-8e3c-98a8396f380b

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 38

1  Was it just the spotters?
2      A.  No.  It was everybody from a different
3  department -- not everybody, but someone who was
4  interested in safety and thought you could do
5  something different to make things better and safer.
6      Q.  Well, how big a group was it at these safety
7  meetings?
8      A.  Maybe 15 people, 20.  I'm not -- you had
9  them from different shifts, too.  Like, in ours, maybe
10  10, 15 people for each shift.
11     Q.  Okay.  So you would have these meetings
12  about once a month with 10 or 15 people.  Correct?
13     A.  Yes.
14     Q.  And someone who was specifically assigned to
15  safety within the plant ran these meetings?
16     A.  Yes.  It wasn't always Dan Usrey.  It was
17  someone, whoever he appointed or whoever wanted to get
18  in there and get involved.
19     Q.  Was it somebody different every time or was
20  there any one person?
21     A.  No.  I think it was the same.
22     Q.  The same person?
23     A.  You know, yes, whoever wanted to lead it.  I
24  mean I don't --

Page 39

1      Q.  Was it a member of management who would lead
2  it?
3      A.  Supervisor, I think.
4      Q.  A supervisor?
5      A.  Would be there, or a lead.  Yes, I do
6  believe there was just a lead there.
7      Q.  You said you recalled people being made fun
8  of.  Can you relate what happened?
9      A.  Oh, for an instance?
10     Q.  Yes.
11     A.  They would say, oh, I don't believe they're
12  hurt.  They're faking it.
13     Q.  Well, who would say that?
14     A.  I don't remember; just someone that was in
15  the group.
16     Q.  A member of management or another employee
17  or --
18     A.  It was somebody on the safety committee, I
19  mean because we have had quite a few meetings, you
20  know.  They just --
21     Q.  So these were safety committee meetings?
22     A.  Uh-huh.
23     Q.  Okay.  That's a yes?
24     A.  Yes.

Page 40

1      Q.  And you were a member of the safety
2  committee?
3      A.  Yes.
4      Q.  And at these meetings, were there people
5  involved who weren't part of the committee, or was it
6  just a committee meetings?
7      A.  The people that were on the safety
8  committee.
9      Q.  Okay.  And do you recall who said they
10  didn't believe someone else was hurt?
11     A.  No.  I don't recall who said it.
12     Q.  Do you recall when they said that?
13     A.  No.
14     Q.  Was there anything else you remember about
15  people being made fun of at these safety committee
16  meetings?
17     A.  Oh, they just, you know, assumed that
18  because someone had an accident, it's not, you know,
19  they are faking it or -- that's how they talked.
20     Q.  Can you be any more specific than that as to
21  who said or what, specifically, they said?
22     A.  No.
23     Q.  Were there ever times they talked about
24  incidents where they seemed to think that the person

Page 41

1  was actually injured?
2      A.  Yes, I think.  I mean I don't know.  There
3  was, yes, when someone had gotten injured, yes.  I'll
4  just say yes.
5      Q.  Were there ever times when you were a member
6  of the safety committee that you believed someone who
7  had reported an injury wasn't actually injured?
8      A.  No.  I took safety serious.
9      Q.  But you didn't -- at the time of the
10  accident, you were considering not reporting it?
11     A.  I'm not -- I -- I'm not sure.
12     Q.  You don't recall whether or not you --
13     A.  I might have told someone that it happened.
14     Q.  Did you ever complain about the potholes?
15     A.  In the safety meetings, and they kept saying
16  that they were going to get them filled, they were
17  going to get them filled.
18     Q.  Who said that?
19     A.  Dan Usrey has known about it.
20         My lead, Ken at the time, he said he has
21  gone up there and complained about the potholes.
22         Actually, I mean they are not potholes.
23  These were craters.  I mean a pothole is like this,
24  (indicating), four inches wide.  This was the whole

11  (Pages 38 to 41)

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

ff05bcad-f7ec-4366-8e3c-98a8396f380b

Page 42

1  length of the drive, the width.
2           (Whereupon Agent Deposition
3           Exhibit No. 6 was marked for
4           identification.)
5  BY MR. CHRISTLIEB:
6      Q.  You said that the accident happened on
7  January 2nd.  Did you work on January 3rd, '05?  Did
8  you work the next day?
9      A.  No.  I went to the doctor.
10     Q.  So did you report the accident the next day,
11 on January 3rd?
12     A.  It might not have been the next day, but the
13 following day when I went back to work.
14     Q.  So you went back to work on January 4th.
15 Correct?
16     A.  Yes.
17     Q.  Do you recall whether you were scheduled to
18 work on January 3rd?
19     A.  No, I don't recall.
20     Q.  You don't remember one way or the other
21 whether you were scheduled to work on the 3rd?
22     A.  If it was a workday or a weekday, then
23 probably, yes.
24     Q.  You worked Monday through Friday?

Page 43

1      A.  No.
2      Q.  What was your work schedule?
3      A.  Sunday through Thursday, I think.  I went in
4  on Sunday.
5      Q.  And on January 4th when you came in to work,
6  did you immediately report the accident or did you go
7  to work first?
8      A.  I'm not sure.
9      Q.  You don't recall?
10     A.  No, I don't recall.
11     Q.  You don't recall whether you moved any
12 trucks that day?
13     A.  No, I didn't.  I do believe I filled out an
14 accident report right away.
15     Q.  Okay.
16     A.  Before continuing to work.
17     Q.  So the first thing you did is you came in
18 and you filled out an accident report?
19     A.  Yes.
20     Q.  Where do you fill out an accident report?
21     A.  In the office.
22     Q.  And the document that's been put in front of
23 you, Exhibit 6, is this the accident report you filled
24 out?

Page 44

1      A.  Not all of it.  There's another sheet to it,
2  I think.
3           (Whereupon Agent Deposition
4           Exhibit No. 7 was marked for
5           identification.)
6  BY MR. CHRISTLIEB:
7      Q.  I'm showing you what's been marked as
8  Exhibit No. 7.  Is this the second sheet?
9      A.  Yes.
10     Q.  Okay.  So the accident report, in total, is
11 Exhibits 6 and 7 together?
12     A.  I am sorry.  What?
13     Q.  The accident report is actually documents 6
14 and 7 together is the report you filled out?  You
15 filled both of these out at the same time?
16     A.  I do believe so.
17     Q.  Okay.  So the accident, according to your
18 statement, and I'm looking at Exhibit 7, occurred on a
19 Sunday, January 2nd, 2005.  So the next day would have
20 been a Monday.  Do you believe you were scheduled to
21 work on that day?
22     A.  Yes.
23     Q.  But you didn't work that day.  You called
24 off?

Page 45

1      A.  Correct, yes.
2      Q.  And you went to the doctor.  Correct?
3      A.  Yes.
4      Q.  And then on January 4th, you came in, and
5  the first thing you did was report this accident.
6  Correct?
7      A.  I'm sorry.  What?
8      Q.  On January 4th you came in, and the first
9  thing you did was fill out this report.  Correct?
10     A.  Correct.
11     MR. DIETCHWEILER:  You know what, Counsel, I'm
12 going to object.  The document doesn't say that.  The
13 document says she called in on Monday, and the doctor
14 saw her on Tuesday morning.  So when you say the
15 document says something else, it doesn't.
16     MR. CHRISTLIEB:  I'm not testifying.  I'm not
17 trying to say that the document says one thing or the
18 other.  I'm just trying to get her recollection of
19 what happened.
20     MR. DIETCHWEILER:  Well, but when you refer to
21 the document to refresh her recollection and you
22 incorrectly state it, I think you're improperly
23 leading the witness with misleading information off of
24 the exhibit.  I mean it clearly says the doctor saw --

DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 46

1  it says, "Doctor seen me on Tuesday morning," not
2  Monday.
3  BY MR. CHRISTLIEB:
4      Q.  Okay.  We will start with that.  Having
5  looked -- I want you to review these documents to
6  refresh your recollection.
7      A.  Okay.
8      Q.  Have you had a chance to look at them?
9      A.  Yes.
10     Q.  Okay.  Now, what do you recall was the
11  sequence of events?  The injury occurred on Sunday,
12  January 2nd, 2005.  Correct?
13     A.  Correct.
14     Q.  What happened on Monday, January 3rd, 2005?
15     A.  I woke up, and I couldn't lift my head off
16  my pillow.  I was very -- I couldn't turn my head.  I
17  was very sore.
18     Q.  Okay.  And did you go to the doctor?
19     A.  I called him, yes.
20     Q.  But did you go to the doctor?
21     A.  No.  He couldn't get me in then, until the
22  next day.
23     Q.  Did you call off work that day?
24     A.  Yes.

Page 47

1      Q.  When did you see your doctor?
2      A.  The following morning after that.
3      Q.  So you saw your doctor on Tuesday, the 4th.
4  Correct?
5      A.  Yes.
6      Q.  And you went to work on the 4th.  Correct?
7      A.  No.  I didn't work on the 4th.
8      Q.  Did you come in to the office?
9      A.  I went in, yes.
10     Q.  And did you fill out these two documents on
11  the 4th, Exhibits 6 and 7?
12     A.  Yes.
13     Q.  On Exhibit 7, the last sentence of your
14  statement, it says, "I didn't fill out a statement on
15  Sunday because I didn't feel anything until the next
16  day when I woke up."  Is that true?
17     A.  Yes.  Well, I had taken Tylenol, so, if you
18  recall, I did say that my neck was burning.
19     Q.  So you saw your doctor Tuesday morning?
20     A.  Yes.
21     Q.  Who is your doctor?
22     A.  Dr. Manatt.
23     Q.  Where is he located?
24     A.  Chicago Heights.

Page 48

1      Q.  And what were your symptoms at that time?
2  What was wrong with you?
3      A.  What was wrong with me?  I couldn't move my
4  neck.  It felt like something -- like, my neck wanted
5  to break off.  I mean the spine just -- it was
6  increasing and --
7      Q.  And what did your doctor do for you?
8      A.  I'm not sure if he sent me to another
9  doctor.  I'm not --
10         (Whereupon Agent Deposition
11          Exhibit No. 8 was marked for
12          identification.)
13  BY MR. CHRISTLIEB:
14     Q.  Okay.  Showing you what's been marked as
15  Exhibit 8, is this the note you got from your doctor
16  on Tuesday, the 4th, 2005?
17     A.  Yes.
18     Q.  And did you take this in to work with you?
19     A.  Yes.
20     Q.  Do you recall who you gave it to?
21     A.  No.  I'm not sure.
22     Q.  Okay.  When you filled out these reports,
23  where did you fill them out?
24     A.  In the break room.

Page 49

1      Q.  Who did you give them to?
2      A.  Dawn Robinson is the one who was there with
3  me.
4      Q.  Who is Dawn Robinson?
5      A.  She was head of security.
6      Q.  And did you understand she was the person
7  that you give these forms to when you have had an
8  accident?
9      A.  That's where they, I do believe, directed me
10  to her.  That's how I got her.
11     Q.  Do you know who directed you to her?
12     A.  It had to be someone in the office.
13     Q.  Did you have any conversations about the
14  injury or the incident with Dawn Robinson?
15     A.  What I put down.
16     Q.  Did she say anything in response?
17     A.  She said that she's surprised no one got
18  hurt before this.  She said she went through it in the
19  golf cart, all of the craters.
20     Q.  Did she say anything else?
21     A.  Not that I remember.
22     Q.  Did you talk to anyone else in the office
23  that day?
24     A.  No, I don't think so.

13  (Pages 46 to 49)

2:07-cv-02113-MPM-DGB    # 16-2    Page 15 of 30

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

**Page 50**

1    Q.  Did you talk to anyone else at Sears that
2  day?
3    A.  No, I don't think so.
4    Q.  Okay.  The note says you're unable to work
5  until you see the ortho M.D.  Do you recall who the
6  orthopedic doctor was that you went to see?
7    A.  No.
8    Q.  Do you recall when you went to see that
9  doctor?
10    A.  No.
11    Q.  Was it within a week or two weeks after you
12  saw --
13    A.  It was -- as soon as they could get me in,
14  I'm sure I went.
15    Q.  So you didn't work that Tuesday.  Correct?
16    A.  Correct.
17    Q.  And, in fact, you didn't work until after
18  you saw this orthopedic doctor.  Correct?
19    A.  Correct, I think.  I don't know.
20    Q.  You don't recall whether you worked before
21  you saw the orthopedic doctor?
22    A.  No.  I couldn't work.  I was off work by the
23  doctor.
24

**Page 51**

1          (Whereupon Agent Deposition
2          Exhibit No. 9 was marked for
3          identification.)
4  BY MR. CHRISTLIEB:
5    Q.  Okay.  I'm handing you what's been marked as
6  Exhibit No. 9.  The bottom half of the exhibit appears
7  to be another doctor's note.  Is the doctor's note at
8  the bottom of the exhibit a doctor's note you received
9  from -- is it a doctor's note you received and brought
10  in to work?
11    A.  Oh, yes.  I remember now.
12    Q.  And you got it on January 17th, '05?
13    A.  I do believe.
14    Q.  Do you remember the name of your doctor now
15  that you went to see, the orthopedic doctor?
16    A.  Aribindi -- I don't know if it was Aribindi.
17  It might have been -- Dr. Reddy is the one who gave me
18  an epidural in my neck.
19    Q.  Dr. Reddy?
20    A.  Yes.
21    Q.  Did he give you that on January 17th, '05?
22    A.  No.
23    Q.  Was it later than that?
24    A.  Uh-huh.

**Page 52**

1    Q.  Okay.  So you don't recall which of the
2  three doctors at the top of this doctor's note you saw
3  on January 17th?
4    A.  I would have to say Dr. Aribindi.
5    Q.  Does that look like Dr. Aribindi at the
6  bottom of the doctor's note, that signature to you?
7    A.  Yes, the first -- yes.
8    Q.  And Dr. Aribindi, on January 17th, '05,
9  cleared you for light duty.  Correct?
10    A.  Yes.
11    Q.  And your restrictions were that you couldn't
12  lift over five pounds, no repetitive use of the upper
13  extremities, and no pushing or pulling.  Correct?
14    A.  Correct.
15    Q.  And you took this doctor's note in to Sears.
16  Correct?
17    A.  Yes.
18    Q.  Do you recall whether you took it in on the
19  17th or whether it was the next day?
20    A.  No, I don't remember.  I'm assuming,
21  whenever I got a note, I took it straight to them.
22    Q.  So you're assuming it was the same day?
23    A.  I'm assuming.
24    Q.  And do you recall whether you worked on the

**Page 53**

1  17th?
2    A.  No, I don't recall.
3    Q.  Okay.  Was there a period of time when you
4  were on light duty?
5    A.  I'm not sure.
6    Q.  Do you recall working on the 18th and 19th
7  of January, 2005?
8    A.  Yes, I do.
9    Q.  So on the 18th and 19th of January of 2005,
10  were you on light duty?
11    A.  In the office, I do believe.
12    Q.  So that's a yes?
13    A.  Yes.
14    Q.  And what were you doing in the office?
15    A.  Computer work.  I do believe I was sitting
16  there for hours.
17    Q.  Data entry, was that what you were doing or
18  what kind of computer --
19    A.  I'm not sure.  I don't do computers.  I
20  don't know.  It was whatever they told me to put in
21  the computer.
22    Q.  Okay.  Was the work you were doing within
23  the restrictions on the note, Exhibit 9?
24    A.  No.

LISA A. KOTRBA & ASSOCIATES, LTD. (312) 855-1834

ff05bcad-f7ec-4366-8e3c-98a8396f380b

Page 54

1    Q. I mean were you having to lift anything over
2  five pounds?
3    A. No.
4    Q. Okay. Were you repeatedly using your upper
5  extremities?
6    A. Uh-huh.
7    Q. You were?
8    A. Uh-huh.
9    Q. Is that a yes?
10    A. I'm sorry. Yes.
11    Q. Because you had to type?
12    A. And stare at a monitor.
13    Q. Were you having to push or pull?
14    A. I'm not sure at that time. I don't think
15  so.
16    Q. Okay. Do you believe that the computer work
17  you were doing then was inconsistent with your
18  restrictions?
19    A. What do you mean?
20    Q. Do you believe they were having you do work
21  that you couldn't do because of your restrictions?
22    A. Holding my head up for those hours and
23  looking straight ahead was pretty rough, I do believe.
24    Q. At that time did you think there was any job

Page 55

1  at Sears that you could do with these restrictions?
2  Was there a job where you didn't have to hold your
3  head up for extended periods of time?
4    A. I don't know. I don't know what kind of
5  jobs they offer.
6    Q. Have you ever seen a job at Sears that
7  didn't require you to hold your head up?
8    A. You know what, I'm not sure. I know that
9  staring at a monitor for hours is pretty -- without
10  getting up and getting a break.
11    Q. So you didn't have breaks?
12    A. No. We had -- I'm sure we had breaks. I'm
13  saying after, like, three hours of sitting --
14    Q. At some point, I guess after the 18th or
15  19th, you stopped doing this job, correct, the
16  computer job?
17    A. I don't know. I mean it's -- I don't know.
18    Q. You don't recall when you stopped doing the
19  computer job?
20    A. No. I don't know the exact date.
21    (Whereupon Agent Deposition
22    Exhibit No. 10 was marked for
23    identification.)
24

Page 56

1  BY MR. CHRISTLIEB:
2    Q. This Exhibit 10, the bottom of Exhibit 10,
3  appears to be another doctor's note. Is this a
4  doctor's note that you received from Dr. Savio Manatt?
5    A. Yes.
6    Q. Okay. Did you receive it on or about
7  January 21st, 2005?
8    A. That's what the date says.
9    Q. But you don't recall whether you received it
10  on January 21st, 2005?
11    A. I would assume, yes.
12    Q. Okay. It says, "Jo Ann has cervical
13  herniated disk and is unable to work until she sees
14  Dr. Chavez." Did you bring this note in to Sears?
15    A. Yes.
16    Q. Who did you bring it in to?
17    A. One of the secretaries. I'm not sure.
18  There was quite a few of them.
19    Q. Do you recall what day you brought it in to
20  Sears?
21    A. No.
22    Q. Did you work on the day you brought it in to
23  Sears?
24    A. I don't recall.

Page 57

1    Q. Why did you go back to Dr. Savio Manatt on
2  the day you got this note, on January 21st, '05?
3    A. Because my neck wasn't getting any better.
4    Q. And did he recommend that you be off work
5  altogether at that time?
6    A. Until I go see a specialist, I do believe.
7    Q. Was Dr. Chavez that specialist?
8    A. Yes.
9    Q. Was Dr. Aribindi a specialist?
10    A. I'm not sure what kind of a specialist he
11  was.
12    Q. Okay. So did Dr. Manatt -- do you recall
13  whether he said he wanted you to be seeing both
14  Dr. Aribindi and Dr. Chavez concurrently?
15    A. No. I mean I don't know. I -- I think
16  Dr. Chavez had more of a -- I mean that was his
17  specialty. He knew about necks.
18    Q. When you brought this note in to Sears, did
19  you have any conversations with anyone?
20    A. With this note? No, I don't believe so.
21    Q. After you brought this note in, did you work
22  at all at Sears after you brought this note in?
23    A. I don't think so.
24    Q. All right. I want to ask you about the time

2:07-cv-02113-MPM-DGB    # 16-2    Page 17 of 30

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 58

1  period between the day of your accident and the day
2  you came in and did light duty. There's about a
3  two-week time period in there in the beginning of
4  January. What were you doing during the day?
5      A. What do you mean?
6      Q. Were you able to get out of bed? What were
7  your activities during the day during that time?
8      A. Move slowly.
9      Q. Were you able to go about normal, day-to-day
10 activities?
11     A. Not really.
12     Q. Could you dress yourself?
13     A. Yes.
14     Q. Could you feed yourself?
15     A. Yes.
16     Q. Could you drive?
17     A. I think so.
18     Q. Did you drive yourself to the doctor?
19     A. I think so. I'm sure I did.
20     Q. Did you do grocery shopping?
21     A. I'm not sure what I did.
22     Q. Do you recall whether you would have been
23 physically able to go grocery shopping?
24     A. I think. I'm not sure. I know I was

Page 59

1  probably on pain medicine.
2      Q. Did you continue to see, after January 21st,
3  2005, did you continue to see Dr. Aribindi?
4      A. No.
5      Q. Did you see Dr. Reddy after that time?
6      A. No.
7      Q. I think earlier you testified that Dr. Reddy
8  gave you some kind of injection in your neck?
9      A. Correct.
10     Q. When was that?
11     A. Before my surgery to see if it would fix the
12 problem.
13     Q. When was your surgery?
14     A. September 12th.
15     Q. 2005?
16     A. Yes.
17     Q. And Dr. Reddy gave you a shot of some sort?
18     A. Epidural in my neck.
19     Q. Was that weeks before your surgery, days
20 before your surgery?
21     A. I'm not sure of the date. It was before,
22 way before, I do believe, maybe a month before,
23 approximately. I'm not sure.
24     Q. Had you seen Dr. Reddy before he gave you

Page 60

1  the epidural in your neck?
2      A. Maybe to let me know what he was going to
3  do, and when he stuck the needle in my neck, you know,
4  what could happen.
5      Q. Who sent you to Dr. Reddy?
6      A. Dr. Chavez.
7      Q. So after January 21st, Dr. Chavez, was he
8  your primary doctor with respect to your neck?
9      A. Yes.
10         Whenever we get a chance, can we use the
11 restroom?
12     MR. CHRISTLIEB: We can do that right now. Let's
13 go off the record.
14         (Short break in proceedings.)
15         (Whereupon Agent Deposition
16         Exhibit No. 11 was marked for
17         identification.)
18     MR. CHRISTLIEB: Okay. Can we go back on the
19 record, please.
20 BY MR. CHRISTLIEB:
21     Q. I have handed you Group Exhibit 11, which is
22 a bunch of doctors' notes it looks like from a
23 doctors' group called Minimally Invasive Spine
24 Specialists. Is that the group where you saw

Page 61

1  Dr. Chavez?
2      A. Yes.
3      Q. And it looks like each of these reports are
4  signed by Dr. Chavez and also signed by yourself.
5  Correct?
6      A. Yes.
7      Q. Did you turn all of these in to Sears?
8      A. Yes.
9      Q. Did you turn them in yourself? Did you
10 bring them in or did you fax them in?
11     A. I faxed them to them. If I didn't, I know
12 the doctor did.
13     Q. Okay. So you didn't physically bring them
14 in to the office?
15     A. Right.
16     Q. Okay. Each of these say that you are unable
17 to work. Correct?
18     A. Yes.
19     Q. So it's fair to say then that from January
20 21st until at least 11/17/05, you were unable to work.
21 Correct?
22     A. No. I was unable to work from the doctor's
23 statement. Is that what you're saying?
24     Q. Well, it may be that you were unable to work

Page 62

1   even longer than that; but I'm just saying you were
2   definitely unable to work through 11/17/05. Correct?
3      A.  My job, yes.
4      Q.  Okay.  Were you able to work other jobs
5   during that time?
6      A.  No.
7      Q.  Okay.  Now, at some point you had surgery,
8   and I think you said that was around September 12th,
9   2005.  Correct?
10     A.  Yes.
11     Q.  So between January 21st, 2005, and
12  September 12th, 2005, did your physical condition
13  change at all with respect to your neck?  Did it get
14  better?  Did it get worse?
15     A.  I do believe the pain increased.
16     Q.  So you had no improvement during that time
17  period?
18     A.  No.
19     Q.  Why was it that you were faxing or having
20  these faxed to Sears?
21     A.  To keep them informed on my -- on what was
22  going on so I wouldn't lose my job.
23     Q.  Okay.  Did you have -- I'm sorry to keep
24  going back, but I haven't asked you this question yet:

Page 63

1   Did you have any other communications with Sears
2   between the time of your injury to the time you came
3   back to light duty?  Did you have any communications
4   with any Sears managers that we haven't already talked
5   about?
6      A.  Not that I can remember.
7      Q.  And during the time you were working light
8   duty, did you have any discussions regarding your
9   injury or your -- regarding your injury --
10     A.  No.
11     Q.  -- while you were working?  No?
12     A.  No.
13     Q.  Did you have any discussions with anyone,
14  while you were working light duty, about your physical
15  condition?
16     A.  No.  People might have asked me how I was
17  doing.  I might have said, "I'm fine."
18     Q.  Okay.  But nothing other than that.
19  Correct?
20     A.  I guess, yes.
21     Q.  Okay.  Did you have any conversations, while
22  you were working light duty, regarding a worker's comp
23  claim?
24     A.  No.

Page 64

1      Q.  Had you made a worker's comp claim at that
2   point?
3      A.  No, I don't think so.
4      Q.  Between February and November of 2005, at
5   some point did you come in and fill out FMLA paperwork
6   at Sears?
7      A.  Yes, they did, they had me do that.
8      Q.  Do you remember whether someone called you
9   to come in and do that?  How did you know to come in
10  and do that?
11     A.  I think they called me to come in and do
12  that.
13     Q.  Do you remember who called you?
14     A.  Erika -- not Erika, Linda.  She's the one I
15  pretty much dealt with.
16     Q.  And she asked you to come in to fill out the
17  paperwork?
18     A.  Yes, to -- yes.
19     Q.  Do you recall when she called you?
20     A.  No, but I'm -- I mean no.
21            (Whereupon Agent Deposition
22            Exhibit No. 12 was marked for
23            identification.)
24

Page 65

1   BY MR. CHRISTLIEB:
2      Q.  Handing you what's been marked Group No. 12,
3   the top of the first page says, "FMLA Leave
4   Designation."  Is this the paperwork you filled out
5   after Linda Carpenter called you?
6      A.  You know, I'm not sure, but they sent me
7   stuff through the mail after I was there.
8      Q.  After you came in, they sent you something
9   in the mail?
10     A.  Yes, saying -- I'm not sure what it was they
11  had sent me, besides, yes, certified.  Yes, she sent
12  me that certified.
13         This, I don't believe was, like, with the
14  papers that I went home with.
15     Q.  Okay.  Maybe I have stapled too much
16  together here.  At the end of the document, the very
17  last page at the bottom --
18     A.  Correct.
19     Q.  -- that's your signature.  Correct?
20     A.  Yes, on that page.
21     Q.  And you filled that out on or about
22  March 28th, '05, and then if you look at the first
23  page, it has Linda Carpenter's signature, March 29th,
24  '05.

ff05bcad-f7ec-4366-8e3c-98a8396f380b

Page 66

1    A.  Yes.
2    Q.  So could it be that you received -- you
3  didn't receive the first two pages of this document,
4  but you took home the rest of it and filled it out?
5    A.  Okay.  I remember that one.  This one, I do
6  believe was filled out by the doctor.
7    Q.  Okay.
8    A.  Yes.  These were filled out by the doctor.
9  The ones, as far as I know, that I signed, I know this
10  back sheet.
11    Q.  Okay.
12    A.  And, yes, this one (indicating).
13    Q.  So do you see the Sears series of numbers at
14  the bottom right corner?
15    A.  Yes.  That's the fax.
16    Q.  No.  I mean the Sears-000247, for example.
17  Do you see that?
18    A.  Okay.  Yes.
19    Q.  So from 000247 through 251, is this what you
20  gave your doctor to fill out?
21    A.  I do believe so, yes.
22    Q.  Okay.  And you signed it after he filled it
23  out?
24    A.  I'm not sure when I signed it.  I know I

Page 67

1  signed it, so I'm assuming -- I don't know if it was
2  in front of Sears or if it was, like -- I don't
3  remember.
4    Q.  At any rate, you signed it on or about
5  March 28th, '05.  Correct?
6    A.  Approximately.
7    Q.  And do you recall whether you were
8  requesting that your leave be covered under the Family
9  Medical Leave Act?
10    A.  No.  They told me to.
11    MR. DIETCHWEILER:  I object to the
12  characterization that she asked for anything.  I think
13  the company asked her.  That was her testimony.
14  BY MR. CHRISTLIEB:
15    Q.  Okay.  Did you want your leave to be covered
16  under the Family Medical Leave Act?
17    A.  No.  They told me to, so my job would be
18  protected.
19    Q.  Okay.  And did you understand how long your
20  job would be protected under the Family Medical Leave
21  Act?
22    A.  She said they extended it one year.
23    Q.  Who said that?
24    A.  Linda Carpenter.

Page 68

1    Q.  And when did she say that?
2    A.  Well, you know what, it had to be right
3  around when she signed it or the date here, I would
4  assume, 3/29, because she said if I didn't do it, I
5  would lose my job, and I wouldn't be protected under
6  this.
7    Q.  The first two pages of this document,
8  No. 12, that would be 000244 and 000245, do you recall
9  receiving this in the mail?
10    A.  Yes.  I do believe that they sent it to me.
11    Q.  Okay.  Did you read it?
12    A.  Probably.  I mean I know I read it as of
13  right now, but I mean I've seen this before.
14    Q.  Okay.  Did you have a car accident at the
15  end of January 2005?
16    A.  I was in a car that was hit.
17    Q.  Okay.  Where were you in the car, where
18  geographically?
19    A.  Passenger side.
20    Q.  Okay.  But where was the car?  What city
21  were you in?
22    A.  Calumet City.
23    Q.  Where were you going?
24    A.  To pick up my son.

Page 69

1    Q.  Pick him up from what?
2    A.  His father's.
3    Q.  Were you at an intersection at the time?
4    A.  Yes.
5    Q.  Who was driving?
6    A.  At the time, Eddie Agent.
7    Q.  And what happened as far as the accident?
8    A.  We were at a stop.  The guy behind us didn't
9  see, I guess, see us there and came up and hit us from
10  behind.
11    Q.  Were you wearing your seat belt?
12    A.  Yes.
13    Q.  Were you injured in the accident?
14    A.  No, not really.  For precautions, my doctor
15  had me go get an x-ray.
16    Q.  Which doctor?
17    A.  Chavez.
18    Q.  Did you go get an x-ray that day?
19    A.  I think he had me do it, I think, right in
20  his office.  It might have been that day.
21    Q.  Were you already scheduled to go see him
22  that day, or did you go because of the accident?
23    A.  I don't recall, because it was at nighttime
24  when it happened.

Page 70

1    Q.  So you went to his office at night?
2    A.  No.
3    Q.  You went to his office the next day?
4    A.  Yes.  I'm not sure if I spoke to him on the
5  phone or what.  I'm not sure.
6    Q.  Did you speak to him on the phone on the day
7  of the accident?
8    A.  No, because it was, like, 8:00 o'clock at
9  night.
10    Q.  So you spoke to him on the phone the next
11  day.  Correct?
12    A.  Yes.
13    Q.  And then did you go to his office the next
14  day?
15    A.  I'm not sure.
16    Q.  When you eventually talked to him, he said
17  come in and have an x-ray just to be --
18    A.  To make sure there wasn't any damage
19  other than what was already there.
20    Q.  What kind of car were you in when the
21  accident happened?
22    A.  A Nissan.
23    Q.  Do you recall what model?
24    A.  No.

Page 71

1    Q.  What kind of car was the person who
2  rear-ended you in?
3    A.  That, I'm not sure.  It's, like, if I could
4  find my police report.
5    Q.  Did you get a police report?
6    A.  Yes, I did.
7    Q.  Did an ambulance come to the scene?
8    A.  I'm not sure.  There was so much going on in
9  my life, I don't remember so much.
10    Q.  Was anyone else injured in the accident?
11    A.  No.
12    Q.  And you don't recall whether or not an
13  ambulance came?
14    A.  I wasn't injured.  I was already in pain
15  from my accident at work.
16    Q.  Well, did this accident make that pain
17  worse?
18    A.  No.
19    Q.  Was the car damaged?
20    A.  It was scraped, I do believe, on the rear
21  end.
22    Q.  Was the other car damaged?
23    A.  I think his front bumper was.
24    Q.  Was he cited for the car accident?

Page 72

1    A.  I do believe so.
2    Q.  Did you make any claim for insurance with
3  regard to this car accident?
4    A.  No.
5    Q.  And you said you got a copy of the police
6  report?
7    A.  Yes.  I do believe my attorney has one.
8    Q.  Do you have a copy at home?
9    A.  I'm not sure.  I'd have to look.
10    Q.  Was it a Calumet City police officer?
11    A.  Yes.
12    Q.  Do you remember the name of the other
13  driver?
14    A.  No.  It was his grandmother's car that I do
15  believe he borrowed without permission.
16    Q.  Was he arrested or anything?
17    A.  I'm not sure.  I don't know.  I didn't
18  follow up.
19    Q.  Okay.  And you never sued him or were
20  involved in any litigation regarding the accident.
21  Correct?
22    A.  Nope.
23    Q.  Do you recall what the x-rays showed that
24  you had with Dr. Chavez?

Page 73

1    A.  I do believe he said that there was
2  99 percent the same, the same damage.  There was
3  nothing more.
4    Q.  And your pain wasn't any better or worse
5  after this accident.  Correct?
6    A.  It stayed the same, I do believe.
7    Q.  What kind of day-to-day activities could you
8  perform from February to November 2005?  I will go
9  through some.  I assume you were able to walk during
10  that time.  Correct?
11    A.  Yes.
12    Q.  And you could clothe yourself.  Correct?
13    A.  Yes.
14    Q.  Were you able to run?
15    A.  I don't make -- I don't know.  I don't run
16  now.
17    Q.  Right.  But were you able to run?
18    A.  I don't think I did, because I was afraid of
19  falling.
20    Q.  Were you able to drive?
21    A.  I do believe so.
22    Q.  Well, did you drive those five months or
23  however many months that is from February to
24  November 2005?

ff05bcad-f7ec-4366-8e3c-98a8396f380b

2:07-cv-02113-MPM-DGB    # 16-2    Page 21 of 30

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 74

1      MR. DIETCHWEILER: Counsel, if you could clarify
2    that question. Are you talking about professionally?
3    Are you talking about personal transportation? What
4    are you talking about?
5    BY MR. CHRISTLIEB:
6      Q.  Could you drive your personal automobile
7    between February through November of 2005?
8      A.  No.
9      Q.  So you did no driving during that time?
10     A.  No.  I did some; but after my surgery or the
11   epidural, anything that's stuck in your neck, you
12   can't drive.  You have to wear a neck brace.  You
13   can't turn your head.
14     Q.  So you could drive from February until you
15   had your epidural?
16     A.  Whenever the doctor told me; if he said --
17   if he advised that I could, that it wouldn't damage
18   it, paralyze me, you know, because I would always
19   consult him.
20     Q.  Well, what were some other things you
21   couldn't do during that time?
22     A.  Explain.
23     Q.  What were you physically unable to do?  List
24   some day-to-day activities you were unable to do.

Page 75

1      A.  Turn my neck.
2      Q.  Okay.
3      A.  I couldn't turn it without pain.  Let's see.
4    I don't think he wanted me to play basketball.
5      Q.  Did you ask?
6      A.  No.  That was a joke.
7      Q.  All right.  I mean was there anything else,
8    any other kind of activities you were prevented from
9    performing because of your pain?
10     A.  You know, I don't recall, because now since
11   I have had my surgery, I'm, like, feeling really well.
12     Q.  And you don't remember anything about your
13   physical limitations prior to your surgery?
14     A.  No.  I just went back to everyday life.
15     Q.  Okay.  Did you serve as an election judge in
16   Manteno in April of '05?
17     A.  What month?
18     Q.  April.
19     A.  I might have.  I usually do.
20     Q.  What does an election judge do?
21     A.  Just makes sure the ballots are in, are in
22   the ballots, you know, no one is putting -- you know
23   what I'm saying?
24         You don't know what an election judge is?

Page 76

1      Q.  I don't know what they do in Manteno.  I'm
2    just asking what did you do as an election judge?
3      A.  Pretty much took it easy.
4      MR. DIETCHWEILER: You could take the Fifth if
5    you were stuffing the ballots.
6      MR. CHRISTLIEB: That only goes on in the city.
7    BY MR. CHRISTLIEB:
8      Q.  In Manteno, I guess what I'm asking is what
9    was it that you did when a voter came in to vote?
10     A.  Just, you know, hand them a piece of paper
11   if they wanted it, you know, the ballot.
12     Q.  Right.
13     A.  Or just -- it was very, very, you know, you
14   would talk to them, move around.
15     Q.  Okay.
16     A.  Walk, sit.
17     Q.  Did you help set up the voting booths?
18     A.  No, I did not.
19     Q.  Okay.  Were you there the whole day on
20   election day?
21     A.  I was in and out.
22     Q.  How many hours did you work as an election
23   judge?
24     A.  I don't know.  I was there, I don't know,

Page 77

1    probably from 8:00 to 7:00, 8:00 in the morning, I
2    think, I'm not sure, to 7:00 at night.
3          (Whereupon Agent Deposition
4           Exhibit No. 13 was marked for
5           identification.)
6    BY MR. CHRISTLIEB:
7      Q.  I have handed you what's been marked as
8    Exhibit 13.  On the left-hand side about two thirds of
9    the way down, is that your signature?
10     A.  Yes.
11     Q.  Okay.  So did you work as an election judge
12   on April 5th, 2005?
13     A.  Yes.  I was there.
14         (Whereupon Agent Deposition
15          Exhibit No. 14 was marked for
16          identification.)
17   BY MR. CHRISTLIEB:
18     Q.  Okay.  I have handed you what's been marked
19   as Exhibit 14.  This seems to be a letter from a
20   Dr. Steven Delheimer located in Peru, Illinois.  Do
21   you recall seeing Dr. Delheimer?
22     A.  Yes, I do.
23     Q.  Do you recall whether you saw him on or
24   about April 1st, 2005?

2:07-cv-02113-MPM-DGB    # 16-2    Page 22 of 30

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 78

1    A. I'm assuming that's the date of the exam,
2    April 1st.
3    Q. Okay. Do you recall why you went and saw
4    Dr. Delheimer?
5    A. Sears requested it. I did it.
6    Q. I would like you to look on the page at the
7    bottom it says Sears-000354. Are you on that page?
8    A. Yes.
9    Q. Okay. And at the bottom paragraph, it
10   begins, "Augusto Chavez...." If you look about two
11   sentences in this, it says, "The report of 2/6/05 also
12   reflects a history that the claimant was involved in a
13   rear-end motor vehicle accident about ten days prior
14   to that evaluation, which resulted in worsening of her
15   symptoms and required emergency room evaluation,
16   Riverside Hospital in Kankakee."
17        Did you go to Riverside Hospital in Kankakee
18   after your car accident?
19   A. Oh, yes. Yes I did. My doctor -- one of
20   the doctors advised me to do it immediately. Now I
21   remember. Redo.
22   Q. Did you go to the emergency room on the day
23   of the accident?
24   A. I'm not sure.

Page 79

1    Q. It also says here, "....which resulted in
2    worsening of her symptoms." Did it result in
3    worsening of your symptoms?
4    A. That was from Sears' doctor saying that,
5    didn't he?
6    Q. Right. I'm just asking.
7    A. No. I do believe I told you that it --
8    Q. It didn't result in worsening of your
9    symptoms. Correct?
10   A. I was more sore.
11   Q. Were you more sore after the accident?
12   A. After the accident, yes, but they said
13   that's from tightening up.
14   Q. Okay. If you look on page 000355 under
15   "Impression," it says, "....it is my impression that
16   Ms. Coats has degenerative disk disease of her
17   cervical spine."
18        Had you ever been diagnosed before with
19   degenerative disk disease of the cervical spine?
20   A. No.
21   Q. Have you ever had any treatment for
22   degenerative disk disease of the cervical spine?
23   A. No.
24   Q. Did you ever tell Dr. Aribindi about the

Page 80

1    auto accident you were in 10 to 15 years ago?
2    A. I'm not sure.
3    Q. Did you tell Dr. Chavez about the auto
4    accident you were in 10 to 15 years ago?
5    A. I'm not sure either.
6    Q. Okay. Around the time when you came in to
7    fill out paperwork with Linda Carpenter, did you have
8    any discussions with her, other than what we have
9    already discussed today, about your injury?
10   A. I don't understand what you're saying.
11   Like, what date?
12   Q. Well, when you came in to fill out paperwork
13   with Linda Carpenter, whatever date that was.
14   A. To save my job, is that the one? I mean --
15   Q. When you came in to fill out the paperwork
16   that was Exhibit 12, when you came in to fill out the
17   paperwork that's at the end of Exhibit 12, did you
18   have any discussions with Linda Carpenter about your
19   injury?
20   A. She may have asked me -- what are you
21   shaking your head for?
22        Oh, she may have asked me how I was doing,
23   but that's about it. I mean everybody always -- I
24   mean everybody liked everybody there.

Page 81

1         (Whereupon Agent Deposition
2         Exhibit No. 15 was marked for
3         identification.)
4    BY MR. CHRISTLIEB:
5    Q. Okay. I'm handing you what's been marked
6    No. 15. Do you recognize this document?
7    A. Yes. This is, I do believe, one of them
8    that they sent to me.
9    Q. Okay. If you look on the next page, there's
10   a receipt. I believe it bears your signature at the
11   top. Correct?
12   A. Receiving this, yes.
13   Q. Okay. Do you recall whether you received it
14   around April 13th, 2005?
15   A. Yes. That's when, I do believe so. That's
16   what it says, so it has to be.
17   Q. You don't have any reason to believe it
18   wasn't that date. Correct?
19   A. In this day and age, I don't know.
20   Q. Okay. Looking at this document, did you
21   read it?
22   A. Yes.
23   Q. And did you see that it said that your FMLA
24   leave was expiring?

Page 82

1  A.  Yes, and I -- okay.  I do believe I talked
2  to Linda Carpenter after this.
3  Q.  Okay.  It said that your FMLA leave was
4  expiring, and do you see at the bottom where it's
5  checked you, "will not be entitled to job protection
6  for additional leave"?
7  A.  Yes.  That was after.  This was sent after
8  they had told me to put -- or go on family medical to
9  protect my job, and then they sent me this saying, oh,
10 look what we got.  You know, this was, like, look.
11 Q.  So you got this letter, and then you said
12 you talked to Linda Carpenter sometime after you got
13 this letter?
14 A.  I do believe I did.
15 Q.  Do you remember when?
16 A.  No, I don't remember.  If I pulled my phone
17 records from the past years, maybe I could.
18 Q.  So you called Linda Carpenter after you got
19 this.  Correct?
20 A.  Yes.
21 Q.  And what did you say or what did she say?
22 A.  I think I asked her what it meant, because I
23 didn't sign anything.  I mean I don't know.  I went by
24 what they told me that I had to do to protect my job,

Page 83

1  and then I do believe I got this, and I was, like,
2  well -- no.
3      Wait.  I don't think I got this until after
4  my -- okay.  I get it now.  Hold on one second.  Okay.
5  What was your question?  I'm sorry.
6  Q.  After you got this letter, you said you
7  called Linda Carpenter.  Is that correct?
8  A.  I think I did.  I'm not sure, because I
9  wanted to, I think, ask her what was going on or --
10 Q.  Do you recall any conversation you had with
11 her?
12 A.  I think I -- you know what, I'm not sure,
13 but I'm pretty sure -- I mean I'm pretty sure that I
14 talked to her, and they told me that this was just to
15 protect my job, because she goes if you will look, I
16 do believe it says they extended it one year to
17 protect my job.
18 Q.  You think this letter says that?
19 A.  Well, no.  This was what they were
20 explaining to me, that it was protecting my job to go
21 on the Family Medical Leave Act.
22 Q.  Well --
23 A.  Because I didn't sign this.
24 Q.  Right.

Page 84

1  A.  I mean I didn't agree to anything.
2  Q.  Right.  What this letter tells you, correct,
3  is that your FMLA leave was expiring on April 13th,
4  2005?
5  MR. DIETCHWEILER:  I object to the question.  It
6  assumes there was an FMLA leave as opposed to a
7  workman's compensation leave of absence, but you can
8  answer the question.
9  BY MR. CHRISTLIEB:
10 Q.  This letter says that your FMLA leave
11 entitlement will expire on April 13th, 2005.  Correct?
12 A.  No, not -- on this one?  There is no date on
13 that saying when it will expire.  It will expire on
14 4/13 of '05.  Right?
15 Q.  Right.
16 A.  Okay.
17 Q.  And it also says you, "will not be entitled
18 to job protection for additional leave."  Correct?
19 A.  Well, hang on.  Let me see something.  I'm
20 not sure.
21      Alls I was under the understanding from the
22 first one that they said that they put me on this was
23 to protect my job and then, a month or so later, they
24 were telling me that it was expiring and they had to

Page 85

1  do the extended or something to continue it.
2  Q.  Okay.  Do you recall any conversation with
3  Linda Carpenter after you got this letter, No. 15?
4  A.  I'm going to have to say no, because I don't
5  remember.
6  Q.  Okay.  Do you recall any conversations with
7  anyone at Sears after you got this letter but before
8  you had your surgery, for example?  Did you talk to
9  anyone at Sears during that time?
10 A.  I'm not sure.
11 Q.  You had your surgery on September 12th,
12 2005.  Correct?
13 A.  Yes.
14 Q.  What did they do in the surgery?  What was
15 the surgery?  What was the procedure?
16 A.  They put a plate in my neck with six screws.
17 Q.  How long were you off your feet after the
18 surgery?
19 A.  I'm not sure.  I mean can you -- like, are
20 you saying --
21 Q.  How many days until you could walk after the
22 surgery?
23 A.  I walked right away.
24 Q.  Was it an outpatient surgery?

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 86

1    A.  No.  I was in intensive care for a few days.
2    Q.  Okay.  But you were out of the hospital
3  within a week?
4    A.  Uh-huh.
5    Q.  Okay.  And once you got out of the hospital,
6  did you immediately feel better?
7    A.  Yes.
8    Q.  Did you have any physical restrictions after
9  you got out of the hospital?
10    A.  I had a neck brace, I do believe.
11    Q.  But were there things you weren't able to
12  do?
13    A.  He wanted me to take it easy.  He didn't
14  want me, like, to maybe turn my head or something.
15  I'm not sure, but I'm sure I didn't do it, because I
16  was afraid it would break open my stitches.
17    Q.  Okay.  You were still not certified to
18  return to work after the surgery.  Correct?
19    A.  Not -- yes, I guess not, for the healing
20  process.
21    Q.  Okay.  In September you certified that you
22  were unable to return to work.  Correct?
23    A.  I certified who?
24    Q.  I'll show you.  In Exhibit 11, three pages

Page 87

1  from the back, on September 27th, '05 -- I guess you
2  signed it October 18th, '05, it says you were unable
3  to return to work as of 9/27/05.  Is that correct?
4    A.  What page is that?
5    Q.  On the bottom it says 000410.
6    A.  Oh, 410.  Yep.
7    Q.  So you were unable to work in September
8  of '05.  Correct?
9    A.  I guess.  Well, yes.  I mean there was my
10  surgery.  I wanted to go back to work, but --
11    Q.  Okay.  And you weren't able to work in
12  October of '05 either.  Correct?
13    A.  No.
14    Q.  In October of '05, did you have physical
15  limitations in your day-to-day activities?
16    A.  When was it?
17    Q.  October.
18    A.  No.
19    Q.  In November of '05, were you still wearing a
20  neck brace?
21    A.  No.
22    Q.  Did you have any limitations --
23    A.  You know what, I don't think I had any,
24  because he said that I was good to go.

Page 88

1    Q.  You had no neck brace after your surgery?
2    A.  Yes, I did have a neck brace for, I think, a
3  week.
4    Q.  Okay.  But you had no neck brace in November
5  of 2005?
6    A.  No.
7    Q.  Okay.  And you had no physical limitations,
8  because of your neck, in November of 2005?
9    A.  No.  He just said take it easy.
10    Q.  And your doctor signed a note that you were
11  unable to work in November of 2005.  Correct?
12    A.  Correct.
13    Q.  At the bottom of the page 000411, it says
14  you had a follow-up appointment on December 15th,
15  2005.  Correct?
16    A.  Yep.
17    Q.  And do you recall whether you went to that
18  appointment?
19    A.  Yes, I did.
20    Q.  And that appointment was also with
21  Dr. Chavez.  Correct?
22    A.  Yes.
23
24

Page 89

1          (Whereupon Agent Deposition
2           Exhibit No. 16 was marked for
3           identification.)
4  BY MR. CHRISTLIEB:
5    Q.  I will hand you what's been marked as
6  Exhibit No. 16.  Is this the note you got from
7  Dr. Chavez on December 15th, 2005?
8    A.  Yes.
9    Q.  It says, "To whom it may concern, Jo Ann
10  Coats is in medical condition to return to work on
11  December 19th, 2005."  Correct?
12    A.  Yes.
13    Q.  "Full duty"?
14    A.  Yes.
15    Q.  Is that what it says?
16    A.  Yes.
17    Q.  So do you believe you were able to do any
18  job at Sears, physically able to do any job at Sears,
19  as of December 19th, 2005?
20    A.  According to my doctor, yes.
21    Q.  Well, did you believe that?
22    A.  Yes.
23    Q.  Okay.  So at that point, you were able to
24  return to work.  Correct?

23  (Pages 86 to 89)

ff05bcad-f7ec-4366-8e3c-98a8396f380b

2:07-cv-02113-MPM-DGB    # 16-2    Page 25 of 30

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 90

1    A.  Yes.
2    Q.  So at that point, you no longer required a
3  leave of absence.  Correct?
4    A.  Yes.
5    Q.  And at that point, you had no disability.
6  Correct?
7    A.  What do you mean, "disability"?
8    Q.  You said you had no physical limitations.
9  Correct?
10    A.  Yes.  He said I could go back full duty.
11    Q.  Okay.  Did you go in to Sears on
12  December 15th, 2005?
13    A.  I'm not sure what day it was.  I know I was
14  excited about going back.
15    Q.  Okay.  So at some point, either on the 15th
16  or shortly thereafter, you took this note in to Sears.
17  Correct?
18    A.  Yes.  You know, I want to say I took it the
19  day I got it, because I wanted to go back to work.
20    Q.  Okay.  Where did you go?  Where did you take
21  it?
22    A.  I went to the office, the front office.
23    Q.  And who did you see there?
24    A.  Well, first -- are you talking about now

Page 91

1  that we're going into the front?
2    Q.  Wherever you went.
3    A.  I was greeted by Joan.  I don't know what
4  her last name is.
5    Q.  Okay.
6    A.  She said hi, you know, can I help you?
7      I says yes.  I have my note to come back to
8  work.
9      She was, like, okay.  So she went and got
10  Linda Carpenter.  Linda Carpenter had come up to me,
11  and she asked me what I was doing there.
12      I'm, like, well, I'm here to come back to
13  work.  I got my note to be released, and she said,
14  well, how can you come back and work?  I said, well,
15  because I have a doctor's note.
16      She's, like, you've been disabled.  I'm,
17  like, no, I haven't.  She's, like, you were disabled
18  by your injury.  I'm, like, I've been fixed.
19      She's, like, okay.  Well, come back to the
20  back where they sit in those little cubicles, and
21  that's where Erika was there.
22      Oh, before, before that, she had told me,
23  she goes I'm pretty sure we don't have a job for you.
24  I'm, like, well, what do you mean?

Page 92

1      That's when we went and she come back to
2  Erika.  We were standing there, and I think it was
3  Linda first said did you set off the metal detectors?
4  I said why would I do that?  Then they are, like,
5  well, because you've got a metal plate and that in
6  your neck.  Why wouldn't you set them off?
7      I said because I don't think that will
8  happen.  I got plastic put in with six screws.  Then I
9  went into the thing of explaining to them, you know,
10  that it's not metal.  I wouldn't set it off.
11      They thought it was funny.  They were, like,
12  oh, we thought you'd set it off.  I'm, like, no.  It's
13  plastic.  It should be dissolved within six months to
14  a year.
15    Q.  Did they say anything else or did you say
16  anything else?
17    A.  They told me -- Linda told me that she will
18  let me know when I can start back to work, and they
19  just, you know, kind of like laughed among themselves,
20  you know.  That was it, I guess.
21    Q.  Did they say anything about needing to talk
22  to Robin Batka?
23    A.  I know Erika Schwanbeck, I'm not sure what
24  her exact name is, I know she got on the phone and was

Page 93

1  talking to someone.
2    Q.  But you don't know who she was talking to?
3    A.  No.
4    Q.  Okay.  Did they say anything else or did you
5  say anything else in that conversation?
6    A.  I'm not sure.  I mean I might have said I
7  wanted to come back to work, you know.
8    Q.  Okay.
9    A.  I was ready.
10    Q.  Okay.  So then you left?
11    A.  Yes.  I do believe I left.
12    Q.  Did you get any phone call or phone message
13  left from Robin Batka after that day?
14    A.  No.  I got a letter.
15        (Whereupon Agent Deposition
16         Exhibit No. 17 was marked for
17         identification.)
18  BY MR. CHRISTLIEB:
19    Q.  Okay.  I will hand you what's been marked
20  No. 17.  Is this the letter you received?
21    A.  Yes.
22    Q.  On the second page there's a receipt with
23  your signature dated 12/20/05.  Do you believe you
24  received this letter on or about 12/20/05?

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 94

1    A.  No.  I do believe -- well, I know it was
2  pretty fast right after I went in with my slip.
3    Q.  Okay.  So when you received this letter,
4  what did you do?
5    A.  Cried.
6    Q.  Okay.  Did you call anyone at Sears?
7    A.  I do believe I might have called someone to
8  find out about my benefits.
9    Q.  Okay.
10    A.  And when I called down to Georgia, they said
11  there has to be some kind of a mistake, because it was
12  a work injury, that I couldn't be fired.
13      I'm, like, alls I know is I want to get my
14  benefits, because I need to live.
15    Q.  Do you know who you called in Georgia?
16    A.  I might have it all written down at my
17  house.  I know it was -- it was whoever they told me
18  to call.  I know it was in Georgia.  It was a service,
19  obviously, a service center, because I asked them to
20  release my 401(k) and that, and they said they
21  couldn't, because I was still employed by them.
22      And then I'm, like, but I have a letter
23  right here saying that I'm not, and then they were,
24  like, well, there must be some mistake, because there

Page 95

1  was a work injury.
2      (Whereupon Agent Deposition
3      Exhibit No. 18 was marked for
4      identification.)
5  BY MR. CHRISTLIEB:
6    Q.  I will hand you what's been marked as
7  No. 18.  Did you receive the letter that's been marked
8  No. 18?
9    A.  Yes, I do believe I did.
10    Q.  Okay.  And do you remember whether you
11  received that letter before or after you received
12  Exhibit 17?
13    A.  I got this one before Sears, this one
14  (indicating).  I got this one before that one.
15    Q.  Could you use the numbers, please.
16    A.  Oh, I got Exhibit 17 before 18.
17    Q.  At that time, did you have any
18  conversation with Robin Batka or Linda Carpenter or
19  Erika Schwanbeck?
20    A.  I'm not -- I'm not sure.
21    Q.  You don't recall any conversation with any
22  of them?
23    A.  I'm not sure.  I was pretty upset about
24  losing my job.

Page 96

1    Q.  Did you write a letter?
2    A.  Yes.  Yes, I did.  I do remember that.
3      (Whereupon Agent Deposition
4      Exhibit No. 19 was marked for
5      identification.)
6  BY MR. CHRISTLIEB:
7    Q.  Okay.  Is this a letter you sent on or about
8  December 28th, 2005?  By "this" I'm referring to
9  Exhibit No. 19.
10    A.  Yes.
11    Q.  Who did you send it to?
12    A.  Robin Batka.
13    Q.  Did you send it anywhere else?
14    A.  No, I don't think so, maybe, oh, Sears
15  Associate Service Center maybe.
16    Q.  Is that in Georgia?
17    A.  Yes.  That's the only one I would send it
18  to.  It would be just to her and to this one
19  (indicating).
20    Q.  Do you recall whether you sent it to both or
21  you just --
22    A.  No.  I know I sent it to Robin for sure.
23    Q.  And you're not sure, but you think you may
24  have sent it to the Associate Service Center.

Page 97

1  Correct?
2    A.  Correct.  You know, I do believe I sent it
3  to Associate Service, too.
4    Q.  Okay.  Other than what we have already
5  discussed, do you recall any other conversations with
6  anyone at Sears regarding your injury?
7    A.  When?
8    Q.  At any time.
9    A.  Not to my knowledge, no.
10    Q.  Or regarding your accident?
11    A.  To a security guard when I filled out my
12  accident report.
13    Q.  Do you recall a specific conversation with
14  him at that time?
15    A.  It was a her.
16    Q.  Or with her at that time?
17    A.  Just explaining to her what happened.
18    Q.  Okay.  Did she say anything back to you?
19    A.  Yes.  I already told you about she was
20  surprised that no one has gotten hurt before this.
21    Q.  Okay.  Did you have any conversations with
22  anyone at Sears regarding your worker's compensation
23  claim?
24    A.  No.

ff05bcad-f7ec-4366-8e3c-98a8396f380b

Page 98

1    Q.  Do you recall when you filed your worker's
2    compensation claim?
3    A.  No.
4    Q.  Did you have any other conversations with
5    anyone at Sears regarding your disability?
6    A.  No.
7    Q.  Are you aware of anyone hired at Sears after
8    you attempted to return to work on December 19th,
9    2005?
10   A.  Explain that.  I don't understand.
11   Q.  Do you know of anyone who was hired at Sears
12   after December 19th, 2005?
13   A.  In what position?
14   Q.  In any position.
15   A.  Yes.
16   Q.  Who?
17   A.  Sue Ganno.  She was security.
18   Q.  Do you recall when she was hired there?
19   A.  A year ago.
20   Q.  Anyone else?
21   A.  His name was Dave, but I'm not sure of his
22   last name.
23   Q.  When was that?
24   A.  He just got hired a few months ago.

Page 99

1    Q.  Anyone else?
2    A.  No, not that I know of, that I can recall
3    that they said they worked there.
4    MR. CHRISTLIEB:  Okay.  I would like to take
5    about a five-minute break.
6        (Short break in proceedings.)
7        (Whereupon Agent Deposition
8         Exhibit No. 20 was marked for
9         identification.)
10   BY MR. CHRISTLIEB:
11   Q.  I have handed you what's been marked
12   Exhibit 20.  Do you recognize this document?
13   A.  Me?
14   Q.  Yes.
15   A.  Yes.
16   Q.  And is that your signature on the second
17   page, about halfway down?
18   A.  Yes.
19   Q.  Is this your worker's compensation
20   settlement regarding your injury at Sears?
21   A.  Yes.
22   Q.  Okay.  At some point you contacted the EEOC
23   regarding making a charge of discrimination.  Correct?
24   A.  Yes.

Page 100

1    Q.  Do you recall when you first called them?
2    A.  Yes.  It was -- let me think.  When I first
3    called them, I don't know the exact date.  I think it
4    was after I had gotten terminated.
5    MR. CHRISTLIEB:  Okay.  I will show you a
6    document that might refresh your recollection.
7        (Whereupon Agent Deposition
8         Exhibit No. 21 was marked for
9         identification.)
10   BY MR. CHRISTLIEB:
11   Q.  The first page of what has just been handed
12   to you, Exhibit 21, appears to be a letter from the
13   EEOC to you.  Do you recall receiving this letter?
14   A.  Yes.
15   Q.  Okay.  It says at the top, "Dear Ms. Jo
16   Agent, Thank you for contacting us on December 26th,
17   2006, at 4:53 p.m."  Does that refresh your
18   recollection as to when you called the EEOC?
19   A.  Yes.
20   Q.  And was it on December 26th, 2006?
21   A.  I do believe so.
22   Q.  Do you recall calling them before
23   December 26th, 2006?
24   A.  No, I don't recall.

Page 101

1    Q.  Okay.  At some time after you called them,
2    did you fill out a questionnaire?
3    A.  Yes.
4        (Whereupon Agent Deposition
5         Exhibit No. 22 was marked for
6         identification.)
7    BY MR. CHRISTLIEB:
8    Q.  This is Exhibit No. 22.  Is this the
9    questionnaire you filled out?
10   A.  Yes.
11   Q.  At the end, you'll see that your
12   signature on the last page, about two thirds of the
13   way down?
14   A.  Yes.
15   Q.  And it's dated January 5th, 2007.  Do you
16   believe that's when you filled this questionnaire out?
17   A.  Yes.
18   Q.  Did you fill this out at the EEOC?
19   A.  No.
20   Q.  You filled it out at home?
21   A.  Yes.
22   Q.  Okay.  And you sent it to the EEOC?
23   A.  Yes.
24   Q.  All right.  Did you talk to an EEOC

26 (Pages 98 to 101)

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 102

1    investigator at the time you filled this out, or did
2    you call with any questions about it?
3        A.  An investigator.
4        Q.  Do you remember the name of the
5    investigator?
6        A.  No.
7        Q.  Do you remember where he was located?
8        A.  Chicago.
9        Q.  And at some point, did the EEOC send you a
10   charge to fill out?
11       A.  I do believe so.
12           (Whereupon Agent Deposition
13           Exhibit No. 23 was marked for
14           identification.)
15   BY MR. CHRISTLIEB:
16       Q.  I will show you what's been marked as
17   Exhibit No. 23.  Is this the EEOC charge you filled
18   out?
19       A.  Yes.
20       Q.  Did you go to the EEOC to fill this out?
21       A.  No.
22       Q.  Did you sign it on or about January 20th,
23   2007?
24       A.  Yes.

Page 103

1        Q.  And is that your signature at the bottom of
2    Exhibit 23?
3        A.  Yes.
4        Q.  Did you have any help in filling this out?
5        A.  No.
6        Q.  The received date on this says January 25th,
7    2007.  Do you have any reason to believe that the EEOC
8    received it on some other date other than January
9    25th, 2007?
10       A.  No, I don't think so.
11       Q.  Did you discuss the charge with the
12   investigator before you signed it?
13       A.  Oh, yes, I think I did.  I'm not -- I know
14   I've spoke to him.  I'm not sure if I -- can you
15   explain that one again to me?
16       Q.  I'm talking about the charge itself.  I mean
17   it seems to have been typed in.  Did you do the
18   typing?
19       A.  No.  I didn't do that.
20       Q.  Did the investigator do that?
21       A.  Someone did it.  It wasn't me.
22       Q.  You don't know who did it?
23       A.  Well, I am assuming it came straight from
24   them.  Right?

Page 104

1        Q.  Straight from the EEOC?
2        A.  Yes.
3        Q.  So the EEOC sent you that already filled
4    out, and you just signed it.  Correct?
5        A.  After we had talked, yes.
6        Q.  But you talked to them about what you wanted
7    to have appear in the typing?
8        A.  No.  I -- you know what, I'm not sure.
9        Q.  Okay.
10       A.  Alls I did, I did a statement to them on the
11   phone and in writing.
12       Q.  Is what's typed there true and correct as
13   far as --
14       A.  Yes, I do believe so.
15       Q.  Okay.  In December of 2005, did you
16   understand that you had been terminated by Sears?
17       A.  Yes.
18           (Whereupon Agent Deposition
19           Exhibit No. 24 was marked for
20           identification.)
21   BY MR. CHRISTLIEB:
22       Q.  Okay.  I will hand you what's been marked as
23   Exhibit No. 24.  These are your Answers to
24   Interrogatories.  Correct?

Page 105

1        A.  Yes.
2        Q.  And did you sign the verification on page 6
3    and on page 7?  I guess the verification is on page 7.
4        A.  Yes.
5        Q.  Is that your signature?
6        A.  Yes.
7        Q.  In response to Interrogatory No. 1, it says
8    you're seeking lost income at a rate of $36,705 a
9    year, plus benefits, from December 16th, 2005, to the
10   present.  Correct?
11       A.  Yes.
12       Q.  And you worked at least some of the time
13   between the end of 2005 and the present.  Correct?
14       A.  Yes.
15       Q.  Interrogatory No. 2 on page 2 says you
16   worked for Parsec from August 2006 to December 2006 as
17   a spotter.  Is that correct?
18       A.  Yes.
19       Q.  And you were making $14.60 an hour.
20   Correct?
21       A.  Yes.
22       Q.  Did you have benefits at Parsec?
23       A.  No.
24       Q.  No health insurance?

27  (Pages 102 to 105)

ff05bcad-f7ec-4366-8e3c-98a8396f380b

Page 106

1    A. No.
2    Q. No savings plan or anything?
3    A. Nothing.
4    Q. Did you look for work prior to August
5 of 2006?
6    A. Work? No, I don't believe I did.
7    Q. How did you come to find the job at Parsec?
8    A. It was through -- I don't know what his name
9 is, Dan -- Don. His name is Don from unemployment.
10 He would give me leads.
11    Q. So you were looking for work prior to
12 August 2006?
13    A. Yes.
14    Q. And did you begin looking for work right
15 away, in January of '06?
16    A. Yes.
17    Q. Did you have interviews?
18    A. You know, I don't think I did. I know I put
19 a lot of apps. out there. Just, for some reason,
20 nobody -- I don't know if they checked my back
21 references or what.
22    Q. And you were receiving unemployment at $975
23 every two weeks from January of '06 to June of '06.
24 Correct?

Page 107

1    A. Yes.
2    Q. All right. When there was the mass layoff
3 at Parsec, did you continue to get unemployment after
4 that point?
5    A. No. I had to wait another, I think, 3
6 months or 6 months for the quarter in order for me to
7 even get anything after Parsec.
8    Q. So you applied, but you couldn't get it
9 right away?
10    A. Right.
11    Q. Okay. And you began getting unemployment in
12 April of '07. Correct?
13    A. Yep.
14    Q. And you got that at $420 a week every two
15 weeks until you were hired by UPS. Correct?
16    A. Yes, yes, because it came just in time when
17 finally somebody hired me.
18    Q. Your benefits were about to run out if you
19 weren't hired by UPS?
20    A. Yes. That was the only income.
21    Q. Have you done anything else to receive
22 income, other than unemployment and your employment at
23 Parsec and UPS, since the end of your employment with
24 Sears?

Page 108

1    A. I was going to say the election. They paid
2 me 125, but that was 2005.
3    Q. That was before?
4    A. Yes. I mean, yes, I drove a truck, a semi,
5 for Donnie Belcher every now and then here and there.
6    Q. Who did you say that was, Donnie Belcher?
7    A. Yes.
8    Q. What kind of business is he in?
9    A. Construction.
10    Q. When did you drive a truck for him?
11    A. It was this last year, like, '07. Every now
12 and then, he needed dirt hauled. I would do whatever
13 I could.
14    Q. How did he pay you, hourly?
15    A. Yes, hourly.
16    Q. What was your rate?
17    A. 10 an hour.
18    Q. And that was just he would kind of call you
19 when he needed you?
20    A. Yes.
21    Q. Okay. What were you hauling for him?
22    A. Dirt.
23    Q. Talking about the election in 2005 for which
24 you served as an election judge in April, your sister

Page 109

1 ran in that election for mayor. Correct?
2    A. Yes.
3    Q. Did you assist her in her campaign?
4    A. What do you mean?
5    Q. Did you help her out in any way with her
6 campaign?
7    A. Well, how? It couldn't have been money.
8    Q. Other than financial assistance.
9    A. I don't know, just -- yes. I supported her.
10    Q. Okay. Did you help put up signs?
11    A. No. My husband did.
12    Q. Did you go with him to help put up signs?
13    A. Yes, I did.
14    Q. Did you go with him to help put up signs in
15 January of 2005?
16    A. I don't think so.
17    Q. In February of 2005?
18    A. I'm not sure. I mean we pretty much went a
19 lot of places together.
20    Q. But prior to the election in 2005,
21 you went with your husband to help put up signs?
22    A. He did the labor part.
23    Q. Okay. Does one of your sisters own property
24 around Manteno?

28 (Pages 106 to 109)

ff05bcad-f7ec-4366-8e3c-98a8396f380b

2:07-cv-02113-MPM-DGB   # 16-2   Page 30 of 30

AGENT vs. SEARS LOGISTICS SERVICE, INC.
DEPOSITION OF JO ANN AGENT                    January 16, 2008

Page 110

1    A.  Yes.
2    Q.  Did you help her with yard work, such as
3  trimming, in 2005?
4    A.  I do not believe so.
5    Q.  You're not sure?
6    A.  No.  I know I didn't.
7    MR. CHRISTLIEB:  All right.  Off the record.
8       (Discussion off the record.)
9    MR. CHRISTLIEB:  I don't have anything else.
10    MR. DIETCHWEILER:  Jo Ann, you have the right to
11  review a transcript of this deposition before it's
12  accepted.  Typically in these situations, people waive
13  that right, because they trust our court reporter to
14  take everything down properly.  You don't have the
15  right to change your testimony.  You've only got the
16  right to change, like, transposed words or misspelled
17  words or maybe somebody's name that was taken down
18  wrong or something, okay.  Again, typically, that
19  right is waived.
20       Do you have a preference as to whether you
21  wish to read it or waive your right to read it?
22    THE WITNESS:  When would I read it?
23    MR. DIETCHWEILER:  Are you going to order it,
24  Counsel?

Page 111

1    MR. CHRISTLIEB:  Yes.
2    MR. DIETCHWEILER:  You would have to read it
3  within the next 28 days.
4       Off the record for a second.
5       (Discussion off the record.)
6    THE WITNESS:  Okay.  Waived.
7       FURTHER DEPONENT SAITH NOT
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 112

1  STATE OF ILLINOIS )
2            )SS:
3  COUNTY OF C O O K )
4    I, Barbara J. Polke, a notary public within
5  and for the County of Cook and State of Illinois, do
6  hereby certify that heretofore, to-wit, on the 16th
7  day of January, 2007, JO ANN AGENT personally appeared
8  before me at Suite 700, 200 East Court Street,
9  Kankakee, Illinois, a witness in a certain cause now
10  pending and undetermined in the United States District
11  Court for the Central District of Illinois, Urbana
12  Division, wherein Jo Ann Agent, et cetera, is
13  plaintiff and Sears Logistics Service, Inc., is
14  defendant.
15    I further certify that the said witness was
16  first duly sworn to testify the truth, the whole
17  truth and nothing but the truth in the cause afore-
18  said; that the testimony then given by said witness
19  was reported stenographically by me, in the presence
20  of the said witness, and afterwards reduced to
21  typewriting by Computer-Aided Transcription, and the
22  foregoing is a true and correct transcript of the
23  testimony so given by said witness as aforesaid.
24    I further certify that the signature of the

Page 113

1  witness to the foregoing deposition was waived by
2  agreement of counsel for the respective parties.
3    I further certify that there were present at the
4  taking of this deposition the attorneys as
5  hereinbefore noted.
6    I further certify that I am not counsel for nor in
7  any way related to the parties to this suit, nor am I
8  in any way interested in the outcome thereof.
9    In testimony whereof I have hereunto set my hand
10  and affixed my notarial seal this _____ day of
11  _____, 2008.
12
13
14    Notary Public, Cook County, Illinois
15    C.S.R. License No. 084-002486
16
17
18
19
20
21
22
23
24

E-FILED
Friday, 29 February, 2008  03:19:33 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

# ASSOCIATE STATEMENT INJURY

**This form is to be completed by the ASSOCIATE on the DATE OF INJURY or as soon as possible.**

## ASSOCIATE INFORMATION    01427992

| | SERVICE DATE: | |
|---|---|---|
| ASSOCIATE NAME    JoAnn Coats | SOCIAL SECURITY NUMBER    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 | TELEPHONE NUMBER    468.0621 |
| STREET ADDRESS    239 So. poplar | CITY    manteno | STATE and ZIP CODD    IL 60950 |
| DATE OF BIRTH    11/24/62 | SEX    Female | MARITAL STATUS    Single | NUMBER OF DEPENDENTS    2 |
| JOB TITLE    Spotter | DEPARTMENT    Shipping | UNIT NUMBER    88440 |

## DESCRIPTION OF ACCIDENT (use additional pages if necessary)

| DATE OF ACCIDENT    1/2/05 | TIME OF ACCIDENT    Around 3:00  (PM) | DATE REPORTED TO SUPERVISOR    1/4/05 |
|---|---|---|

LOCATION WHERE ACCIDENT OCCURED

Near inbound guard Shack around west end

DESCRIBE WHAT YOU WERE DONG WHEN THE ACCIDENT OCCURRED

Driving my truck around west side of Recieving Sid

DESCRIBE HOW THE ACCIDENT HAPPENED

hit holes in yard bounced up And Down a few times PreHy Hard

WERE YOU DOING REGULARLY ASSIGNED WORK? IF NO, EXPLAIN:

Yes

WERE YOU INJURED AS A RESULT OF THE ACCIDENT? IF YES, DESCRIBE YOUR INJURY.

Yes    Soreness in neck and Shoulder    Neck/Shoulder pain    Can't bend Neck Soreness

WERE THERE ANY WITNESSES? IF YES, LIST THEM BELOW.

No

WAS AN AMBULANCE CALLED? YES or (NO)

HOSPITAL WHERE TREATMENT RECEIVED? *(Select one)*    ST. MARY'S CLINIC    or    ST MARY'S HOSPITAL

In signing this form, I hereby attest to the validity of the above information and authorize SLS to release any information necessary to the processing of this claim by the SLS Claim Adminstrator.

Signature: JoAnn Coots    Date: 1/4/05

Supervisor Signature:    Date:

Safety Team Member / AP Signature:    Date:

CONSENT FORM SIGNED    YES    NO

Sears - 000192

AGENT    Dep. Ex. 6 ID
Barbara J. Polke, CSR 1/16/08

AGENT Dep. Ex. 7 ID
Barbara J. Polke, CSR 1/6/08

DATE OF STATEMENT 1/4/05

## STATEMENT

JoAnn Coats                        , an associate of Sears
Logistics Services, freely make the following statement to Dawn
_____ , who I know to be a representative of
Sears Logistics Services.

I have been employed at SLS Manteno       , since 1998 ,
as a ASSOCIATE             ; my Social Security number is
359-5F-5226 .

On Sunday Jan 2 2005 I was driving
truck I came around west side
Of inbound gaurd shack hitting holes in
Yard bouncing up + Down several times
went home the next morning
I woke up And could not move my
head was very stiff. Called in
on Monday, Doctor seen me on tuesday
morning. ~~When I woke up On Monday~~
I I didn't fill out a statement on
Sunday because I didn't feel anything
until the next day when I woke up.
~~It was fine up to Sunday, that~~

I have read this statement, the contents of which are true facts, that have
been discussed with _____
and me on this date.  I have made this statement of my own free will.  No
threats or promises were made to me, as an inducement to give this statement.

INTERVIEWER Dawn Robinson
DATE 1-04-05

SIGNATURE JJ Coats
DATE 1/5/05

TIME
WITNESS
WITNESS

DATE
DATE    TIME
DATE    TIME

Telephone: (708) 754-7777

**SAVIO G. MANATT, M.D.**
BOULEVARD MEDICAL ASSOCIATES

DEA #AM 3083430

30 E. 15th Street                                      Chicago Heights, IL 60411

Name _Joanne Coats_     Date _11 4 l05_

Address_____

Rx

Joanne has pain on neck and shoulders and is unable to work until she

☐ Label   sees ortho M.D

Refill - 0 - 1 - 2 - 3 - 4 - PRN

☐ May Substitute _____, M.D.

☐ May Not Substitute _____, M.D.

AGENT Dep. Ex. 8 ID
Barbara J. Polke, CSR 1/16/08



SLS, Inc.
1600 Boudreau Rd.
Manteno, IL 60950
815-468-2148
FAX 815-468-6634

# Fax    LIBERTY MUTUAL

To: Matt Bruce                From: Erika Schwanbeck

Fax: 603 334-6077            Pages: ___ / ___ (including this one)

Phone:                       Date: 1-18-05

Re: Drs. Slip on Jo Ann Coats  Claim # wc413-785745

☒Urgent    ☐For Review    ☐Please Reply

●Comments:

Attached

JAN-17-2005 01:39PM FROM-                    T-958  P 001/001  F-068

20060 GOVERNORS DRIVE • OLYMPIA FIELDS, IL 60461
PHONE: 708-283-2600    FAX: 708-283-1250

N.H. REDDY, M.D.    RAM P. ARIBINDI, M.D.    NEAL J. LABANA, M.D.

FOR  JoAnn Coats    DATE 1-17-05

ADDRESS _____    AGE _____

℞ light duty only —
No lifting over 5 lbs, no
repetetive use of upper extremities
No pushing or pulling.

☐ LABEL
REFILL ___ TIMES

_____ M.D.  _____
DISPENSE AS WRITTEN              MAY SUBSTITUTE

AGENT Dep. Ex. 9 ID
Barbara J. Polke, CSR 1/16/08

Sears – 000334



1600 BOUDREAU RD.
MANTENO, IL 60950
(815)468-2000
FAX (815)468-2156

AGENT Dep. Ex. 10 ID
Barbara J. Polke, CSR 1/16/08



LIBERTY MUTUAL

| To: | Matt Bruce | From: | Erika Schwanbeck |
|---|---|---|---|
| Fax: 603 334-8077 | | PHONE: 815 468-2148 Pages: / | |
| Phone: 847 413-9090 | | Date: 01/24/05 | |

Re: JoAnn Coats          WC413 - 785745

☒ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

● Comments:

Attached: Per my phone call - Off Work Slip on above.

---

Telephone: (708) 754-7777                                DEA #AM 3093436

**SAVIO G. MANATT M.D.**
BOULEVARD MEDICAL ASSOCIATES

30 E. 15th Street                                Chicago Heights, IL 60411

Name Joanne Coats          Date 1-21-05

Address

R   Joanne has severed
lumbated disc and is
unable to work until she

☐ Label      is Discharged
Refill - 0 · 1 · 2 · 3 · 4 · PRN

☐ May Substitute _____ M.D.

☐ May Not Substitute _____ M.D.

Sears – 000335

Next Appt 2/8/05

# MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.** • **Richard E. Freeman, M.D.** • **Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G• Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819

## PATIENT WORK STATUS

PATIENT'S NAME _Jo Ann Coats_    APPT. DATE _2/17/05_

CLAIM # _____    DOI: _____

SOCIAL SECURITY # _____ ATTENDING PHYSICIAN _Dr Chavez_

DIAGNOSIS: _____

## WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS

- [ ] RETURN TO WORK WITH NO RESTRICTIONS
  ON _____
- [ ] RETURN TO WORK WITH RESTRICTIONS
  ON _____
- [X] CANNOT WORK    _Undetermined_
  ANTICIPATED RETURN TO WORK DATE _____
- [ ] MMI REACHED _____
- [ ] PPI ASSESSED _____
- [ ] WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING
OVER _____ LBS.
[ ] No  [ ] Occas.  [ ] Freq.
BENDING BELOW KNEE HEIGHT
[ ] No  [ ] Occas.  [ ] Freq.
TWISTING OR STRETCHING
[ ] No  [ ] Occas.  [ ] Freq.
CERVICAL EXTENSION
[ ] No  [ ] Occas.  [ ] Freq.
- [ ] NO WORKING OVER CHEST HEIGHT
- [ ] NO SITTING> _____ HOURS
- [ ] NO STANDING> _____ HOURS
- [ ] NO DRIVING> _____ HOURS
- [ ] CHANGE POSITIONS AS NEEDED

- [ ] SEATED WORK ONLY
- [ ] NO SQUATTING
- [ ] NO KNEELING
- [ ] NO CLIMBING STAIRS/LADDERS

**UPPER EXTREMITY**
- [ ] NO LIFTING OVER _____ LBS.
- [ ] NO USE OF AFFECTED EXTREMITY
- [ ] SPLINT REQUIRED
- [ ] CAST REQUIRED
- [ ] NO REPETITIVE PUSHING
- [ ] NO REPETITIVE PULLING
- [ ] NO REPETITIVE GRASPING
- [ ] NO USE ABOVE SHOULDER
- [ ] NO VIBRATORY TOOLS

**IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"**

ANTICIPATED MMI: _____

TREATMENT PLAN: _Patient to continue a symptomatic correction_
_Try Cervical Traction_

Physician: _____

FOLLOW-UP APPT. _2 wks._    DATE _3/03/05_  TIME _1145_

I have received and understand the above instructions _Jo Ann Coats_
Patient's Signature

EMPLOYER: _____    FAX: _____

OTHER: _____    FAX: _____

Sears – 000337

GROUP
AGENT Dep. Ex. 11 ID
Barbara J. Polke, CSR 1/16/08

TT/1 2/17 3:58

WANG 785745   MAR 10 2005

# MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.** • **Richard E. Freeman, M.D.** • **Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G • Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819

## PATIENT WORK STATUS

PATIENT'S NAME Coates, Jo Ann                        APPT. DATE 3-22-05

CLAIM # _____   DOI: _____

SOCIAL SECURITY # _____   ATTENDING PHYSICIAN Dr Chavez

DIAGNOSIS: _____

### WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS

☐ RETURN TO WORK WITH NO RESTRICTIONS
ON _____

☐ RETURN TO WORK WITH RESTRICTIONS
ON _____

☒ CANNOT WORK  (undetermined)
ANTICIPATED RETURN TO WORK DATE: _____

☐ MMI REACHED _____

☐ PPI ASSESSED _____

☐ WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING
OVER _____ LBS.
☐ No  ☐ Occas.  ☐ Freq.

BENDING BELOW KNEE HEIGHT
☐ No  ☐ Occas.  ☐ Freq.

TWISTING OR STRETCHING
☐ No  ☐ Occas.  ☐ Freq.

CERVICAL EXTENSION
☐ No  ☐ Occas.  ☐ Freq.

☐ NO WORKING OVER CHEST HEIGHT
☐ NO SITTING> _____ HOURS
☐ NO STANDING> _____ HOURS
☐ NO DRIVING> _____ HOURS
☐ CHANGE POSITIONS AS NEEDED

☐ SEATED WORK ONLY
☐ NO SQUATTING
☐ NO KNEELING
☐ NO CLIMBING STAIRS/LADDERS

**UPPER EXTREMITY**
☐ NO LIFTING OVER _____ LBS.
☐ NO USE OF AFFECTED EXTREMITY
☐ SPLINT REQUIRED
☐ CAST REQUIRED
☐ NO REPETITIVE PUSHING
☐ NO REPETITIVE PULLING
☐ NO REPETITIVE GRASPING
☐ NO USE ABOVE SHOULDER
☐ NO VIBRATORY TOOLS

**IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"**

ANTICIPATED MMI: _____

TREATMENT PLAN: ~ Cervical Traction
~ Analgesics as needed.
Patient may need surgery : C5-C6 @ foraminal Stenosis

Physician: _Dr Chavez_

FOLLOW-UP APPT. 3 wks.          DATE 4/9/05          TIME 930

I have received and understand the above instructions _____

Jo Ann Coates
Patient's Signature

EMPLOYER: _____          FAX: _____

CARRIER: _____          FAX: _____

OTHER: _____          FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL. THANK YOU.

Sears – 000347

WC 413-785745

# MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.**  •  **Richard E. Freeman, M.D.**  •  **Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690

~~2001 U.S. Hwy. 41, Suite C, Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819~~

PATIENT'S NAME Coats Jo Ann                          APPT. DATE 4-12-05

CLAIM # _____  DOI: _____

SOCIAL SECURITY # _____  ATTENDING PHYSICIAN Dr Chavez

DIAGNOSIS: _____

## — WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS —

**BACK/LOWER EXTREMITY**

| | |
|---|---|
| ☐ RETURN TO WORK WITH NO RESTRICTIONS ON ___ | LIFTING, PUSHING, PULLING OVER ___ LBS. ☐ No ☐ Occas. ☐ Freq. |
| ☐ RETURN TO WORK WITH RESTRICTIONS ON ___ | BENDING BELOW KNEE HEIGHT ☐ No ☐ Occas. ☐ Freq. |
| ☒ CANNOT WORK    UNDETERMINED | TWISTING OR STRETCHING ☐ No ☐ Occas. ☐ Freq. |
| ☐ MMI REACHED ___ | ☐ No ☐ Occas. ☐ Freq. |
| ☐ PPI ASSESSED ___ | ☐ NO WORKING OVER CHEST HEIGHT |
| ☐ WORK RESTRICTIONS ARE PERMANENT | ☐ NO SITTING> ___ HOURS |

☐ SEATED WORK ONLY
☐ NO SQUATTING
☐ NO KNEELING
☐ NO CLIMBING STAIRS/LADDERS

**UPPER EXTREMITY**
☐ NO LIFTING OVER ___ LBS.
☐ ___
☐ CAST REQUIRED
☐ NO REPETITIVE PUSHING
☐ NO REPETITIVE PULLING
☐ NO REPETITIVE GRASPING
☐ NO USE ABOVE SHOULDER
☐ NO VIBRATORY TOOLS

☐ NO STANDING> ___ HOURS
☐ NO DRIVING> ___ HOURS
☐ CHANGE POSITIONS AS NEEDED

### IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"

ANTICIPATED MMI: _____

TREATMENT PLAN: Continue c symptomatic tx Patient to be scheduled for surgery — 3 months → Fusion

Physician: _____

FOLLOW-UP APPT. after - surgery    DATE _____    TIME _____

I have received and understand the above instructions ___ JoAnn Coats
Patient's Signature

EMPLOYER: _____    FAX: _____

CARRIER: _____    FAX: _____

OTHER: _____    FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL. THANK YOU.

Sears – 000349

W8413-985745

MAY 16 2005

# MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.** • **Richard E. Freeman, M.D.** • **Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G• Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819

## PATIENT WORK STATUS

PATIENT'S NAME _Coats, JoAnn_    APPT. DATE _5-12-05_

CLAIM # _____    DOI: _____

SOCIAL SECURITY # _____ ATTENDING PHYSICIAN _Dr Chavez_

DIAGNOSIS: _____

---

**WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS**

☐ RETURN TO WORK WITH NO RESTRICTIONS ON _____

☐ RETURN TO WORK WITH RESTRICTIONS ON _____

☒ CANNOT WORK  _UNDETERMINED_ ANTICIPATED RETURN TO WORK DATE: _____

☐ MMI REACHED _____

☐ PPI ASSESSED _____

☐ WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING OVER _____ LBS.
☐ No  ☐ Occas.  ☐ Freq.
**BENDING BELOW KNEE HEIGHT**
☐ No  ☐ Occas.  ☐ Freq.
**TWISTING OR STRETCHING**
☐ No  ☐ Occas.  ☐ Freq.
**CERVICAL EXTENSION**
☐ No  ☐ Occas.  ☐ Freq.
☐ NO WORKING OVER CHEST HEIGHT
☐ NO SITTING> _____ HOURS
☐ NO STANDING> _____ HOURS
☐ NO DRIVING> _____ HOURS
☐ CHANGE POSITIONS AS NEEDED

☐ SEATED WORK ONLY
☐ NO SQUATTING
☐ NO KNEELING
☐ NO CLIMBING STAIRS/LADDERS

**UPPER EXTREMITY**
☐ NO LIFTING OVER _____ LBS.
☐ NO USE OF AFFECTED EXTREMITY
☐ SPLINT REQUIRED
☐ CAST REQUIRED
☐ NO REPETITIVE PUSHING
☐ NO REPETITIVE PULLING
☐ NO REPETITIVE GRASPING
☐ NO USE ABOVE SHOULDER
☐ NO VIBRATORY TOOLS

**IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"**

ANTICIPATED MMI: _____

TREATMENT PLAN: _- Continue c Symptomatic Rx_
_- Awaiting Insurance decision about surgical Rx_

Physician _____

FOLLOW-UP APPT. _1 wo_    DATE _6/09/05_    TIME _9:15_

I have received and understand the above instructions _____ _JoAnn Coats_
                                                          Patient's Signature

---

EMPLOYER. _____    FAX: _____

CARRIER. _____    FAX: _____

OTHER: _____    FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL. THANK YOU.

Sears – 000350

# MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.** • **Richard E. Freeman, M.D.** • **Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G • Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819

## PATIENT WORK STATUS

PATIENT'S NAME __Coats, Joann__    APPT. DATE __6-24-05__

CLAIM # _____    DOI: _____

SOCIAL SECURITY # _____    ATTENDING PHYSICIAN __Dr. Chavez__

DIAGNOSIS: _____

## — WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS —

- ☐ RETURN TO WORK WITH NO RESTRICTIONS ON _____
- ☐ RETURN TO WORK WITH RESTRICTIONS ON _____
- ☑ CANNOT WORK __UNDETERMINED__ ANTICIPATED RETURN TO WORK DATE _____
- ☐ MMI REACHED _____
- ☐ PPI ASSESSED _____
- ☐ WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING OVER _____ LBS.
☐ No   ☐ Occas.   ☐ Freq.

**BENDING BELOW KNEE HEIGHT**
☐ No   ☐ Occas.   ☐ Freq.

**TWISTING OR STRETCHING**
☐ No   ☐ Occas.   ☐ Freq.

**CERVICAL EXTENSION**
☐ No   ☐ Occas.   ☐ Freq.

- ☐ NO WORKING OVER CHEST HEIGHT
- ☐ NO SITTING> _____ HOURS
- ☐ NO STANDING> _____ HOURS
- ☐ NO DRIVING> _____ HOURS
- ☐ CHANGE POSITIONS AS NEEDED

- ☐ SEATED WORK ONLY
- ☐ NO SQUATTING
- ☐ NO KNEELING
- ☐ NO CLIMBING STAIRS/LADDERS

**UPPER EXTREMITY**
- ☐ NO LIFTING OVER _____ LBS.
- ☐ NO USE OF AFFECTED EXTREMITY
- ☐ SPLINT REQUIRED
- ☐ CAST REQUIRED
- ☐ NO REPETITIVE PUSHING
- ☐ NO REPETITIVE PULLING
- ☐ NO REPETITIVE GRASPING
- ☐ NO USE ABOVE SHOULDER
- ☐ NO VIBRATORY TOOLS

**IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"**

ANTICIPATED MMI: _____
TREATMENT PLAN: __Symptomatic → Analgesic__ _____
_____
_____

Physician: _____

FOLLOW-UP APPT. __1 mo.__    DATE __7/26/05__    TIME __9:00__

I have received and understand the above instructions __Joann Coats__
Patient's Signature

EMPLOYER: _____    FAX: _____
CARRIER: _____    FAX: _____
OTHER: _____    FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL  THANK YOU.

JC413-785.745

AUG - 2 2005

JUL 29 2005

# MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.** • **Richard E. Freeman, M.D.** • **Augusto R. Chavez, M.D.**
20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G • Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0891

## PATIENT WORK STATUS

PATIENT'S NAME Coats, JoAnn     APPT. DATE 7.27.05

CLAIM # _____ DOI: _____

SOCIAL SECURITY # _____ ATTENDING PHYSICIAN Dr. Chavez

DIAGNOSIS: _____

## WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS

☐ RETURN TO WORK WITH NO RESTRICTIONS
ON _____

☐ RETURN TO WORK WITH RESTRICTIONS
ON _____

☐ CANNOT WORK   Undetermined
ANTICIPATED RETURN TO WORK DATE: _____

☐ MMI REACHED _____

☐ PPI ASSESSED _____

☐ WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING OVER ____ LBS.
☐ No ☐ Occas. ☐ Freq.
BENDING BELOW KNEE HEIGHT
☐ No ☐ Occas. ☐ Freq.
TWISTING OR STRETCHING
☐ No ☐ Occas. ☐ Freq.
CERVICAL EXTENSION
☐ No ☐ Occas. ☐ Freq.
☐ NO WORKING OVER CHEST HEIGHT
☐ NO SITTING> _____ HOURS
☐ NO STANDING> _____ HOURS
☐ NO DRIVING> _____ HOURS
☐ CHANGE POSITIONS AS NEEDED

☐ SEATED WORK ONLY
☐ NO SQUATTING
☐ NO KNEELING
☐ NO CLIMBING STAIRS/LADDERS
**UPPER EXTREMITY**
☐ NO LIFTING OVER _____ LBS.
☐ NO USE OF AFFECTED EXTREMITY
☐ SPLINT REQUIRED
☐ CAST REQUIRED
☐ NO REPETITIVE PUSHING
☐ NO REPETITIVE PULLING
☐ NO REPETITIVE GRASPING
☐ NO USE ABOVE SHOULDER
☐ NO VIBRATORY TOOLS

### IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"

ANTICIPATED MMI: _____

TREATMENT PLAN: To Continue & analgesics : Vicodin
Will Consider to Try : Epidural Steroid Injection .

Physician: _____

FOLLOW-UP APPT. 1 month or 2 weeks after ESI   DATE _____ TIME _____

I have received and understand the above instructions ____ JoAnn Coats
Patient's Signature

EMPLOYER: _____ FAX: _____

CARRIER: _____ FAX: _____

OTHER: _____ FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL. THANK YOU.

Sears – 000368

RTW Ic

WC443-785745

## MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.** • **Richard E. Freeman, M.D.** • **Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G • Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819

AUG 30 2005

### PATIENT WORK STATUS

PATIENT'S NAME: Coats, Joann     APPT. DATE: 8/25/05

CLAIM # _____     DOI: _____

SOCIAL SECURITY # _____     ATTENDING PHYSICIAN: Dr Chavez

DIAGNOSIS: _____

### WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS

- ☐ RETURN TO WORK WITH NO RESTRICTIONS ON _____
- ☐ RETURN TO WORK WITH RESTRICTIONS ON _____
- ☒ CANNOT WORK ANTICIPATED RETURN TO WORK DATE: _____
- ☐ MMI REACHED _____
- ☐ PPI ASSESSED _____
- ☐ WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING OVER _____ LBS.
☐ No ☐ Occas. ☐ Freq.
BENDING BELOW KNEE HEIGHT
☐ No ☐ Occas. ☐ Freq.
TWISTING OR STRETCHING
☐ No ☐ Occas. ☐ Freq.
CERVICAL EXTENSION
☐ No ☐ Occas. ☐ Freq.
- ☐ NO WORKING OVER CHEST HEIGHT
- ☐ NO SITTING> _____ HOURS
- ☐ NO STANDING> _____ HOURS
- ☐ NO DRIVING> _____ HOURS
- ☐ CHANGE POSITIONS AS NEEDED

- ☐ SEATED WORK ONLY
- ☐ NO SQUATTING
- ☐ NO KNEELING
- ☐ NO CLIMBING STAIRS/LADDERS

**UPPER EXTREMITY**
- ☐ NO LIFTING OVER _____ LBS
- ☐ NO USE OF AFFECTED EXTREMITY
- ☐ SPLINT REQUIRED
- ☐ CAST REQUIRED
- ☐ NO REPETITIVE PUSHING
- ☐ NO REPETITIVE PULLING
- ☐ NO REPETITIVE GRASPING
- ☐ NO USE ABOVE SHOULDER
- ☐ NO VIBRATORY TOOLS

### IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"

ANTICIPATED MMI: _____

TREATMENT PLAN: To be scheduled for surgery _____

Physician: _____

FOLLOW-UP APPT. Post - op     DATE _____     TIME _____

I have received and understand the above instructions    John Coats
_____
Patient's Signature

EMPLOYER: _____     FAX: _____

CARRIER: _____     FAX: _____

OTHER: _____     FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL. THANK YOU.

Sears – 000369

# MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.** • **Richard E. Freeman, M.D.** • **Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G • Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819

## PATIENT WORK STATUS

PATIENT'S NAME _Coats, JoAnn_  APPT. DATE _9-27-05_

CLAIM # _____  DOI: _____

SOCIAL SECURITY # _____  ATTENDING PHYSICIAN _Dr Chavez_

DIAGNOSIS: _____

## WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS

☐ RETURN TO WORK WITH NO RESTRICTIONS
ON _____

☐ RETURN TO WORK WITH RESTRICTIONS
ON _____

☒ CANNOT WORK  _undetermined_
ANTICIPATED RETURN TO WORK DATE: _____

☐ MMI REACHED _____

☐ PPI ASSESSED ___ _____

☐ WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING OVER _____ LBS.
☐ No ☐ Occas. ☐ Freq.
BENDING BELOW KNEE HEIGHT
☐ No ☐ Occas. ☐ Freq.
TWISTING OR STRETCHING
☐ No ☐ Occas. ☐ Freq.
CERVICAL EXTENSION
☐ No ☐ Occas. ☐ Freq.
☐ NO WORKING OVER CHEST HEIGHT
☐ NO SITTING> _____ HOURS
☐ NO STANDING> _____ HOURS
☐ NO DRIVING> _____ HOURS
☐ CHANGE POSITIONS AS NEEDED

☐ SEATED WORK ONLY
☐ NO SQUATTING
☐ NO KNEELING
☐ NO CLIMBING STAIRS/LADDERS

**UPPER EXTREMITY**
☐ NO LIFTING OVER _____ LBS.
☐ NO USE OF AFFECTED EXTREMITY
☐ SPLINT REQUIRED
☐ CAST REQUIRED
☐ NO REPETITIVE PUSHING
☐ NO REPETITIVE PULLING
☐ NO REPETITIVE GRASPING
☐ NO USE ABOVE SHOULDER
☐ NO VIBRATORY TOOLS

**IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"**

ANTICIPATED MMI: _____

TREATMENT PLAN: _Continue symptomatic Rx_
_To have X Ray Cervical Spine in 2 wks_
_Increase activity as tolerated_

Physician: _____

FOLLOW-UP APPT. _2 wk_  DATE _10/18/05_  TIME _1200_

I have received and understand the above instructions _JoAnn Coats_
Patient's Signature

EMPLOYER: _____  FAX: _____

CARRIER: _____  FAX: _____

OTHER: _____  FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL. THANK YOU.

Sears – 000410

WC413-785745

## MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.  •  Richard E. Freeman, M.D.  •  Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G • Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819

### PATIENT WORK STATUS

PATIENT'S NAME _Coats, JoAnn_          APPT. DATE _10-18-05_

CLAIM # _____          DOI: _____

SOCIAL SECURITY # _____  ATTENDING PHYSICIAN _Dr. Chavez_

DIAGNOSIS: _____

### WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS

☐ RETURN TO WORK WITH NO RESTRICTIONS
ON _____

☐ RETURN TO WORK WITH RESTRICTIONS
ON _____

☐ CANNOT WORK
ANTICIPATED RETURN TO WORK DATE: _____

☐ MMI REACHED _____

☐ PPI ASSESSED _____

WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING
OVER _____ LBS.
☐ No  ☐ Occas.  ☐ Freq.

BENDING BELOW KNEE HEIGHT
☐ No  ☐ Occas.  ☐ Freq.

TWISTING OR STRETCHING
☐ No  ☐ Occas.  ☐ Freq.

CERVICAL EXTENSION
☐ No  ☐ Occas.  ☐ Freq.

☑ NO WORKING OVER CHEST HEIGHT
☐ NO SITTING> _____ HOURS
☐ NO STANDING> _____ HOURS
☐ NO DRIVING> _____ HOURS
☐ CHANGE POSITIONS AS NEEDED

☐ SEATED WORK ONLY
☐ NO SQUATTING
☐ NO KNEELING
☐ NO CLIMBING STAIRS/LADDERS

**UPPER EXTREMITY**
☐ NO LIFTING OVER _____ LBS.
☐ NO USE OF AFFECTED EXTREMITY
☐ SPLINT REQUIRED
☐ CAST REQUIRED
☐ NO REPETITIVE PUSHING
☐ NO REPETITIVE PULLING
☐ NO REPETITIVE GRASPING
☐ NO USE ABOVE SHOULDER
☐ NO VIBRATORY TOOLS

### IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"

ANTICIPATED MMI: _____

TREATMENT PLAN: _ Refer pain/discomfort back front → Take med/pain _
_ To have X-Ray C-Spine in two. _

Physician: _[signature]_

FOLLOW-UP APPT. _two._          DATE _11/17/05_   TIME _9:00_

I have received and understand the above instructions  _JoAnn Coats_
                                                         Patient's Signature

EMPLOYER: _____     FAX: _____

CARRIER: _____      FAX: _____

OTHER: _____        FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL. THANK YOU.

# MINIMALLY INVASIVE SPINE SPECIALISTS, S.C.

**Patrick J. Sweeney, M.D.** • **Richard E. Freeman, M.D.** • **Augusto R. Chavez, M.D.**

20060 Governors Drive • Olympia Fields, IL 60461 • Phone (708) 283-2225 • Fax (708) 283-2690
2001 U.S. Hwy. 41 • Suite G • Schererville, IN 46375 • Phone (219) 322-0487 • Fax (219) 322-0819

NOV 2 2 2005

## PATIENT WORK STATUS

PATIENT'S NAME: Coats, JoAnn    APPT. DATE 11-17-05

CLAIM #: WC 413-785745    DOI: _____

SOCIAL SECURITY #: _____    ATTENDING PHYSICIAN: Dr Chavez

DIAGNOSIS: S/P Sic?

NOV 2 2 2005

### WORK STATUS / MODIFIED DUTIES / INSTRUCTIONS

☐ RETURN TO WORK WITH NO RESTRICTIONS ON _____

☐ RETURN TO WORK WITH RESTRICTIONS ON _____

☑ CANNOT WORK
ANTICIPATED RETURN TO WORK DATE: _____

☐ MMI REACHED _____

☐ PPI ASSESSED _____

☐ WORK RESTRICTIONS ARE PERMANENT

**BACK/LOWER EXTREMITY**
LIFTING, PUSHING, PULLING OVER ____ LBS.
☐ No ☐ Occas. ☐ Freq
BENDING BELOW KNEE HEIGHT
☐ No ☐ Occas. ☐ Freq
TWISTING OR STRETCHING
☐ No ☐ Occas. ☐ Freq.
CERVICAL EXTENSION
☐ No ☐ Occas. ☐ Freq.
☐ NO WORKING OVER CHEST HEIGHT
☐ NO SITTING> ____ HOURS
☐ NO STANDING> ____ HOURS
☐ NO DRIVING> ____ HOURS
☐ CHANGE POSITIONS AS NEEDED

☐ SEATED WORK ONLY
☐ NO SQUATTING
☐ NO KNEELING
☐ NO CLIMBING STAIRS/LADDERS
**UPPER EXTREMITY**
☐ NO LIFTING OVER ____ LBS.
☐ NO USE OF AFFECTED EXTREMITY
☐ SPLINT REQUIRED
☐ CAST REQUIRED
☐ NO REPETITIVE PUSHING
☐ NO REPETITIVE PULLING
☐ NO REPETITIVE GRASPING
☐ NO USE ABOVE SHOULDER
☐ NO VIBRATORY TOOLS

**IF NO JOB IS AVAILABLE WITH THE ABOVE STATED MODIFIED DUTIES, CONSIDER "OFF WORK"**

ANTICIPATED MMI: _____

TREATMENT PLAN: - Patient to decrease activity as tolerated
- X-Ray of Cervical Spine - demonstrates lesion on (us.

Physician: _____

FOLLOW-UP APPT. 1 wk    DATE 12/15/05    TIME 9:15

I have received and understand the above instructions    JoAnn Coats    Patient's Signature

EMPLOYER: _____    FAX: _____

CARRIER: _____    FAX: _____

TIER: _____    FAX: _____

SHOULD YOU HAVE ANY QUESTIONS, PLEASE CALL. THANK YOU.

Sears – 000411

C-16OS
ELECTION CO. ROCK ISLAND

**NOTICE**

election judges are required to record write-in votes only for those candidates who have filed a Declaration of Intent to be a Write-In Candidate. The County will supply the judges with a list of all candidates who have filed a Declaration of Intent to be a Write-In Candidate.

**RETURN IN**
**ELECTION RESULT**
**ENVELOPE C-410S**

**TALLY SHEET OF VOTES CAST FOR WRITE-IN CANDIDATES**

At the _CONSOLIDATED_ Election

Held on the _5_ day of _APRIL_

in _2005_
(City, Village, Township, Ward, District, Etc.)

Precinct No. _1_

County of _Kankakee_ and State of Illinois

We hereby Certify that the following is a true and correct tally of votes cast for write-in candidates at the aforesaid election.

_____
Judge's Signature

_____
Judge's Signature

_____
Judge's Signature

_____
Judge's Signature

_____
Judge's Signature

| Ballot Style | NAME OF GOVERNMENTAL UNIT | Office Title and Term | Name ... Candidate | Party Affiliation (Primary Only) | 5 | | 15 | 20 | 25 | 30 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Manteno Library District | Library Trustee | Ami Joy Henderson | / | | | | | | |
| 2 | Manteno Library District | Library Trustee | Ami Joy Henderson | / | | | | | | |
| 2 | Village of Manteno | Village President | Peggy Vaughan | / | | | | | | |

**JUDGES OF ELECTION NOTE!**

TALLY SHEET MUST BE SIGNED BY ALL JUDGES AND RETURNED IN THE ENVELOPE PROVIDED. IF NO WRITE-IN VOTES HAVE BEEN TALLIED, WRITE "NONE" ACROSS THE TALLY SHEET.

PRECINCT _Manteno_

PRECINCT Dep. Ex. _13_ ID
Barbara J. Polke, CSR _1/16/08_

Sears – 000416

NO. _1_

05/24/2005 14:21 FAX 815 224 8009    STEVEN C DELHEIMER MD    MAY    5 2005    ⓧ002/007

# STEVEN C. DELHEIMER, M. D.
### Neurosurgery

## Innovative Medical Exams

920 West Street, Suite 118
Peru, Illinois 61354
Phone (815) 224-8001
Fax    (815) 224-8009

*WC413-785745* (handwritten)

Mr. Matt Bruce
Liberty Mutual
P.O. Box 967900
Schaumburg, IL 60196-7900

RE:    Joann Coats
       Date of Injury:    January 2, 2005
       Date of Exam:      April 1, 2005
       Claim #:           WC413-785745
       Employer:          Sears Logistics Services

Dear Mr. Bruce:

Joann Coats was seen for an Independent Medical Evaluation on April 1, 2005, at my Chicago office regarding the impact of a work-related injury. This evaluation was performed at the request of Liberty Mutual. It should be noted that no patient/doctor relationship was established at the time of this evaluation. In my professional judgment, the opinions contained herein are all to a reasonable degree of medical and surgical certainty.

## HISTORY OBTAINED FROM THE EXAMINEE:

**EXAMINEE'S COMPLAINTS AT THE TIME OF THIS EXAMINATION:**
I had the opportunity to evaluate Ms. Coates on April 1, 2005. At this time, she is complaining of neck pain with bilateral arm pain. She states that the pain begins in the occipital area, radiates to both shoulders, down both arms, and into the forearms. Ms. Coates indicated that the pain is worse in the left arm pain more so than the right arm. She also complains of weakness, and intermittent tingling and numbness in both hands. The weakness is bilateral, equal and symmetrical. She reports difficulty opening bottles, such as when using a twisting motion. She states that the numbness is in her middle, ring and little finger. These three fingers are equally involved, although the middle finger may be slightly more involved on the left hand. Ms. Coats has trouble sleeping secondary to the pain, and indicates that the tingling and numbness is more

*GROUP AGENT* Dep. Ex. **14** ID
Barbara J. Polke, CSR 1/16/08 (handwritten)

Sears – 000352

16:21 FAX 815 224 8008     STEVEN C DELHEIMER MD     ☎003/007

Liberty Mutual
RE:   Joann Coats
      April 1, 2005
      Page 2

noticeable while lying down.  She reports that the pain is somewhat alleviated
with massaging on the inside of her left shoulder.

MEDICATION:
Ms. Coates takes Vicodin every 4 hours, along with Ultracet, but states that she
took no medication the day of my evaluation.

EXAMINEE'S DESCRIPTION OF INJURY:
She indicated an injury on January 2, 2005.  While driving a spotter truck, she
hit a pothole and was "flung around."  She had no immediate pain, reported no
injury to her neck, and denied any flexion or extension of the head or neck.  Ms.
Coates stated that she was merely "flung around in the truck."  The following
morning, she awoke with neck pain in the back of her neck.

EXAMINEE'S HISTORY OF TESTING AND TREATMENT GIVEN:
Ms. Coates states that she has seen her primary care physician, Dr. Manatt, on
several occasions.   She has also been seen by Dr. Aribindi, an orthopedic
surgeon, and Dr. Chavez, a spine surgeon.  She has undergone physical therapy,
and two MRI studies.  Dr. Chavez is now recommending surgery.

OCCUPATIONAL HISTORY:
Ms. Coates job entails driving a spotter truck, which pulls semi-trailers.

MEDICAL RECORDS REVIEWED:
The following is an abstract of records reviewed in conjunction with the April 1,
2005 evaluation.   This abstract briefly summarizes the treatment records that
are pertinent to this case.   Records begin on January 12, 2005 and extending
through March 22, 2005.

Documents reviewed are from the following providers:
- St. James Hospital
  - MRI report, 01-12-2005,
  - Ram Aribindi, MD (Southland Bone and Joint Institute)
  - Augusto Chavez, MD (Midwest Minimally Invasive Spine
    Specialist)

01-12-2005      St. James Hospital:  Review of the MRI report, 01-12-2005,
                reflects that the interpretation by the radiologist noted mild to
                moderate sized central and left sided herniated discs at C5-6,
                causing extrinsic pressure on the dural sac and narrowing of
                the left neural foramen.  In addition, the radiologist reported a
                small central herniated disc at C3-4 with mild extrinsic
                pressure on the dural sac and spinal cord centrally.  The

Sears – 000353

04/22/2005 14:22 FAX 815 224 8009    STEVEN C DELHEIMER MD    @004/007

Liberty Mutual
RE:    Joann Coats
       April 1, 2005
       Page 3

Continued...                remainder of the MR imaging of the cervical spine was
                            essentially negative.    The ordering physician was Dr. Savio
                            Manatt. The clinical history listed neck pain.

01-14-2005                  Ram Aribindi, MD (Southland Bone and Joint Institute):    Dr.
                            Aribindi's consultation report of 01/14/2005, was addressed to
                            Dr. Manatt, reflecting complaints of neck pain related to the
                            claimant's work in a warehouse.    The history in this report
                            alludes to the claimant moving semitrailers in and out of a
                            warehouse with potholes in the pavement.  In addition to the
                            neck pain, the claimant reported numbness and tingling in
                            both hands. Dr. Aribindi does not document any specific date
                            of injury, but rather states in his report that the neck pain had
                            been noted for the past few weeks; and the tingling and
                            numbness had been noted for "some time."    The claimant
                            described numbness along the middle, ring, and little finger of
                            the right hand.    Subjectively, the claimant had some decreased
                            sensation in the little and ring finger, but other than decreased
                            range of motion, no objective findings were identified.    Dr.
                            Aribindi ordered physical therapy and prescribed Mobic.  He
                            also recommended an epidural steroid injection and placed the
                            claimant on light duty, with a release 01-17-2005.

02-08-2005 to
03-22-2005                  Augusto Chavez, MD (Midwest Minimally Invasive Spine
                            Specialist):    The medical records reflect treatment by Dr.
                            Chavez from 02-28-2005 to 03-22-2005, for severe neck pain,
                            left shoulder pain, along with pain and weakness of the left
                            upper extremity.  Dr. Chavez's report alludes to hitting the
                            potholes as a triggering or precipitating factor for the
                            development of the subjective complaints.  The report of 02-08-
                            2005 also reflects a history that the claimant was involved in a
                            rear-end motor vehicle accident about 10-days prior to that
                            evaluation, which resulted in worsening of her symptoms and
                            required emergency room evaluation (Riverside Hospital in
                            Kankakee – no report available).  Dr. Chavez reports of 02-08-
                            2005 & 02-17-2005, reflect that the claimant's symptoms
                            remained unchanged in spite of cervical traction, analgesic and
                            pain medication.    Claimant reported pain in the neck,
                            particularly left side, radiating to the scapular region, shoulder,
                            and down the left arm to the elbow.  Claimant also reported
                            continued tingling sensation in the left middle, ring, and small
                            finger.  Surgery was discussed with the claimant.

Sears – 000354

04/81/2005 14:28 FAX 815 224 9008        STEVEN C DELMEIMER MD        ☑005/007

Liberty Mutual
RE:   Joann Coats
        April 1, 2005
        Page 4

Continued...        Recommendations were to continue with conservative
treatment with follow-up booked in three weeks.

**DIAGNOSTIC REVIEW:**
I reviewed two MRI studies. The first was dated January 12, 2005, and the
second MRI was dated February 12, 2005. The MRI films show evidence of
degenerative disc disease with osteophyte formation at C5-6. However, there
appears to be sequential improvement between the two studies of January 2005
and February 2005. The initial films show what appears to be a disc at the C5-6
level, however, this is not present on the subsequent film.

**NEUROLOGIC EXAMINATION:**
On exam, she is an alert female. She has a fluid range of motion of her neck.
She complains of neck pain with extension, as well as pain with both right and
left lateral bending, but there is no complaint of radicular pain with any planes of
motion of the neck. Her deep tendon reflexes are equal and symmetrical at the
level of the biceps, triceps, and brachioradialis. She has normal strength in all
major motor groups with detailed examination from the deltoids through the
interossei. There is no paraspinal spasm present and her gait is normal.

**IMPRESSION:**
After obtaining a narrative history, performing a neurologic exam and reviewing
medical records, it is my impression that Ms. Coates has degenerative disc
disease of her cervical spine. I would like to point out that this degenerative disc
disease, which is at the C5-6 level, is evidenced by a small left-sided osteophyte
at that level. I would like it noted that there are absolutely no changes on the
right side of the spine that could be causing nerve root compression.

The probability does exist that the mechanism of being "jostled" secondary to
hitting a pot hole, could have exacerbated the claimant's underlying degenerative
disc disease, as she reports having the onset of neck pain within 24-hours of the
incident and seeking medical treatment from her primary care physician within
an estimated time period of 10-days. However, from a neurosurgical perspective
this exacerbation would have been soft tissue in nature, as the MRI study failed
to show any evidence of acute pathology. Secondly, there are no radicular
complaints or objective findings on the neurologic exam to support an acute
injury such as a herniated disc. For these reasons, I would place the claimant at
maximal medical improvement as it relates to the January 2, 2005 alleged injury.

Based on my review of the MRI films, the degenerative changes seen on this study
are left sided and therefore could not account for the claimant's right arm pain. I
would also like to point out that review of the MRI failed to demonstrate any
right-sided degenerative changes or nerve root compression, and furthermore

Liberty Mutual
RE:   Joann Coats
        April 1, 2005
        Page 5

there appears to be sequential improvement when comparing the MRI study from January 2005 to the February 2005 MRI.

Furthermore, the type of tingling and numbness that the claimant described, which involves all five digits equally, but slightly more pronounced in the left middle digit, is consistent with impingement of a different nerve root other than the C6 nerve root. With impingement of the C6 root, numbness involves only the index finger, not the middle, ring or little finger.

It is also important to point out that the mechanism of injury did not involve forceful flexion or extension of the head and neck. Therefore, I cannot relate the claimant's on going subjective complaints to this particular mechanism of injury.

RECOMMENDATIONS:
No further treatment is justified on the basis of the alleged injury of January 2, 2005. This opinion is based on the absence of acute findings on the MRI study, the lack of radicular complaints, and the fact that the neurologic examination today was within normal limits.  The degenerative disc disease, as evidenced by the left sided osteophyte at C5-6, is indicative of a pre-existing condition.

In the event that the claimant proceeds with surgery to address the C5-6 osteophyte, it is my opinion to a reasonable degree of medical and surgical certainty, that any further treatment beyond this date of April 1, 2005, would be on the basis of the claimant's preexisting  degenerative disc disease and not related to the alleged injury of January 2, 2005.

The above analysis is based upon the available information at this time, including the history given by the examinee, the medical records, tests provided, and physical findings.  It is assumed that the material provided is correct.  If more information becomes available at a later date, an additional report may be requested.  Such information may or may not change the opinions rendered in this evaluation.

Thank you for asking me to see this examinee in consultation.  If you have any questions, please do not hesitate to contact me at my Peru office, 815-224-8001. Please direct any and all correspondence to my Peru office as well.

Sears – 000356

04/20/2005  14:23 FAX 815 224 8009     STEVEN C DELHEIMER MD     007/007

Liberty Mutual
RE:   Joann Coats
      April 1, 2005
      Page 6


                                         Sincerely,


                                         Steven C. Delheimer, M. D.
                                         Neurosurgeon
                                         Consultant


scd/jd-1/ad
FC:04-20-2005

Copy Faxed To:     Judy Canavan RN @ 603.334.8077
                   Medical Disability Case Manager

Sears – 000357

(2)

# SEARS
AND SUBSIDIARY COMPANIES

# FMLA LEAVE EXPIRATION NOTICE

Associate: __Jo Ann Coats__    Associate ID#: __01427992__    Unit #: __88440__

Date: __April 11 2005__

Dear __Jo Ann__

This letter is to advise you that your Family & Medical Leave Act ("FMLA") leave entitlement

[X] will expire on: __4|13|05__

[ ] will expire on: _____

[X] Although your rights under the FMLA ceases on the date noted above, you are eligible for additional leave under:

   [X] Sears' Extended Care Leave Policy.

   [ ] State-specific leave as outlined in the **Associate Rights Under Sears' Family & Medical Leave Policies** previously provided and available on www.88sears.com (or from your manager or Unit HR Generalist).

   Please note that you

   [ ] will be entitled to job protection for additional leave.

   [X] will not be entitled to job protection for additional leave.

[ ] You have exhausted all available leave under Sears' policies. Any absences after the date noted above may result in disciplinary action, including action under any applicable attendance policy, up to and including termination.

Remember, if you were out because of your own serious health condition and you will return by the expiration date, you will need to provide Sears with a release to return to work from your health care provider.

Please contact 1-888-88Sears, or your manager or Unit HR Generalist if you have any questions.

__Linda Carpenter__                __Linda Carpenter__                __4|11|05__
Company Representative (Print Name)    Company Representative (Signature)        Date

Updated October 24, 2003

CONFIDENTIAL

Sears - 000005

AGENT Dep. Ex. 15 ID
Barbara J. Polke, CSR 11/6/08

③

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X  *Coats*  ☐ Agent  ☐ Addressee<br>B. Received by ( Printed Name )  C. Date of Delivery<br>*Jr Ann Coats*  4/13/05 |
| 1. Article Addressed to:<br><br>Jo Ann Coats<br>PO Box 333<br>Manteno IL<br>60950 | D. Is delivery address different from item 1?  ☐ Yes<br>If YES, enter delivery address below:  ☐ No<br><br>3. Service Type<br>☑ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☐ Yes |
| 2. Article Number<br>(Transfer from service label) | 7003 1680 0006 5796 1245 |
| PS Form 3811, February 2004  Domestic Return Receipt | 102595-02-M-1540 |

Sears - 000006



AGENT Dep. Ex. 16 ID
Barbara J. Polke, CSR 1/16/08

Sears - 000011



## Logistics

Sears Logistics Services
1600 Boudreau Road
Manteno, IL  60950

December 16, 2005

Jo Ann Coats
PO Box 333
Manteno, IL  60950

Jo Ann,
SLS regrets to inform you that there are no open positions available at this time
within our organization, as you have not actively worked for over 11 months and had
already exhausted your FMLA (Family Medical leave) in April 2005.   We are
currently in the process of releasing our temporary associates and our seasonal as we
are winding down our fourth quarter business.

We will take you off role, effective immediately.   You may call the Associate
Service Center to inquire about any benefits that you were enrolled in.  I have
included a business card with the number to call.

Sincerely,

Robin Batka
Human Resource Manager, SLS

Cc: Dan Usrey
     Erika Schwanbeck

AGENT Dep. Ex. 17 ID
Barbara J. Polke, CSR 1/16/08

Sears - 000016

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Jo Ann Coats
Po Box 333
Manteno, IL
60950

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _Jo Ann Coats_   ☐ Agent   ☐ Addressee

B. Received by ( Printed Name)    C. Date of Delivery

Jo Ann Coats    12/20/05

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered    ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service label)

7003 1680 0006 5795 9754

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540

Sears - 000017

## Sears Associate Service Center
**4740 Hugh Howell Road**
**Tucker, GA  30084-5006**
**1-888-88SEARS**

# Emplid:01427992

December 21, 2005

Jo A Coats  Unit#: 88440
P. O. Box 333
Manteno, IL  60950

Jo Coats,

Our records indicate that your leave of absence will expire on January 20, 2006.

Unless you are medically released to return to work it will be necessary, in accordance with company policy, to terminate your employment on the date your leave expires.. Termination will not affect claims you may have with Worker's Compensation or a disability plan in which you may be enrolled.

Should you not return to work, you will receive a packet explaining the benefits to which you may be entitled.

If you and your physician feel that you would be able to return to work if specific accommodations relative to your former position could be made or you could perform alternate work, please contact your manager to explore the possibilities.

If you allow benefit coverage to lapse while on Leave of Absence, you will have the opportunity to have your benefits reinstated once you have returned to work.

If you have any questions regarding this letter, please contact a Customer Service Representative at.. 1-888-88SEARS (888-887-3277).

Associate Service Center

cc: manager

AGENT Dep. Ex. 18 ID
Barbara J. Polke, CSR 1/16/08

**SEARS**

Sears - 000184

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

12/27/2006

Jo Agent
350 North Birch Apt. 4
Manteno, Illinois 60950

Dear Ms Jo Agent

Thank you for contacting us on 12/26/2006 04:53 PM. Based on the information you provided, it appears your situation may be covered by the laws we enforce. To begin the charge-filing process, please read and complete the entire questionnaire immediately and return it by mail to the field office listed below:

Chicago District Office
500 West Madison Street
Suite 2800
Chicago, Illinois 60661

Please remember to:

- Answer all questions as completely as possible. Incomplete responses may delay further processing of your questionnaire.
- Complete both sides of each page.
- Attach additional pages to complete your responses, if necessary.
- Answer by stating "not known" if you do not know the answer to a question.
- Write "n/a", if the question is not applicable.
- Contact the field office at 866-408-8075 if you have questions about completing this form.

Information about to the laws we enforce and our charge-filing procedures is available on our web site at www.eeoc.gov.

A charge of job discrimination must be filed with the EEOC within 180 days from the date of harm in order to protect your rights. This 180 day filing deadline may be extended to 300 days if the charge is also covered by a state or local job discrimination law. Therefore, it is important that you complete and mail this questionnaire promptly.

Generally, submission of this questionnaire will not meet all requirements for filing a charge. However, this questionnaire will allow the EEOC to review your circumstances further and determine whether we can assist you.

Please call 1-800-669-4000 and provide the transaction number 061226-001042, if you have not heard from the field office after 30 days from the date you mailed the completed questionnaire.

Sincerely,
U.S. Equal Employment Opportunity Commission

*AGENT* Dep. Ex. 21 ID
Barbara J. Polke, CSR 1/16/08

 **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Chicago District Office**

500 West Madison Street, Suite 2800
Chicago, IL 60661
(312) 353-2713
TTY (312) 353-2421
FAX (312) 353-4041

Jo A. Coats
350 N. Birch Apt. #4
Manteno, IL 60950

Re: Jo A. Coats v. Sears Logistics Service

Dear Ms. Coats,

Enclosed is a draft of your charge of employment discrimination. The information you have provided indicates that the matter you complain of may be a violation of one or more of the following laws:

( )      Title VII of the Civil Rights Act of 1964 (Title VII);

( )      The Age Discrimination in Employment Act (ADEA);

( )      The Equal Pay Act (EPA); and/or,

(x)      The Americans with Disabilities Act (ADA).

To facilitate proper handling of this action by the Commission you should:

(x)      Review all the information on the enclosed charge form. If you feel a correction should be made, please call me at (312) 353-8183 to discuss.

(x)      <u>SIGN AND DATE ALL FOUR (5) COPIES OF THE CHARGE</u> in the bottom left-hand block where indicated by an <u>X</u>.

( )      Please initial the second page of the Charge Receipt where indicated by an <u>X</u>.

(x)      Return by mail all copies of the signed and dated charge.

Page 2 of 2

Since a charge must be processed within the time limitations imposed by law, I urge you to complete the steps indicated as soon as possible. Please call me at (312) 353-8739 if you have any questions.

(X)     If you do not return your signed and dated charge to us within thirty (30) days of receipt, or otherwise contact us, your charge may be dismissed. Also, at certain critical stages of the investigation, it may be necessary (for legal reasons) for the Commission to send material by certified mail, return receipt requested. Therefore, you must be sure to claim all such mail while the charge is being processed.

You should be aware that the Commission will cross-file your charge to the Illinois Department of Human Rights ("IDHR") in accordance with our procedures.

Sincerely,

Omayra Rodriguez
Investigator

Date     1 - 17 - 2007

Enclosures

Phone #163

190-2007-0241

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**INTAKE QUESTIONNAIRE**

RECEIVED EEOC
JAN 16 2007
DISTRICT OFFICE

Please immediately complete the entire form and return it to the U.S. Equal Employment Opportunity Commission ("EEOC"). **REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, generally within 180 days or in some places 300 days of the alleged discrimination. Upon receipt, this form will be reviewed to determine EEOC coverage. **Answer all questions as completely as possible, and attach additional pages if needed to complete your response(s). Incomplete responses may delay further processing of your questionnaire by EEOC. If you do not know the answer to a question, answer by stating "not known." If a question is not applicable, write "n/a."**

*(PLEASE PRINT)*

**1.    Personal Information**

Last Name: Coats / Agent , First Name: Jo    MI: A

Street or Mailing Address: 350  N. Birch    Apt Or Unit #: 4

City: Manteno    County: Kankakee    State: IL    Zip: 60950

Phone Numbers: Home: (815) 468-9899    Work: (  )

Cell: (815) 582-6310    Email Address: Jo_Agent@SBCGlobal.net

Date of Birth: 11-24-62    Sex: Male___ Female X    Race: White

National Origin / Ethnicity_____ Do You Have a Disability? Yes ☐    No ☒

Provide The Name Of A Person We Can Contact If We Are Unable To Reach You:

Name: Mary Merkel    Relationship: Sister

Address: 413  So Second St    City: Watseka    State: IL    Zipcode: 60970

Zip: _____ Home Phone: 815 432-2942 Other Phone: (  )

I believe that I was discriminated against by the following organization(s): (Check those that apply)

Employer X    Union_____    Employment Agency_____    Other (Please Specify)_____

**2.    Organization Contact Information**

Organization #1 Name: SLS    Sears Logistics Service

Address: 1600  Bourdevan Rd

City: Manteno    State: IL Zip: 60950    Phone: (815 468-2152

Type of Business: Warehouse    Job Location if different from Org. Address: _____

Human Resources Director or Owner Name: Robin Batka    Phone: 815.468.2152

Number of Employees in the Organization at All Locations: Please Check (✓) One

Less Than 15 ☐    15 – 100 ☐    101 – 200 ☒    201 – 500 ☐    More 500 ☐

Organization #2 Name: _____

Address: _____

City: _____    State: _____ Zip: _____    Phone :(___)_____

AGENT Dep. Ex. 22 ID
Barbara J. Polke, CSR 1/16/08

Sears - 000502

**Type of Business:** _____ Job Location if not at Org. Address: _____

**Human Resources Director or Owner Name:** _____ **Phone:** _____

**Number Of Employees In The Organization At All Locations:** please check (✓) one

Less Than 15 ☐     15 – 100 ☐     101 – 200 ☐     201 – 500 ☐     More 500 ☐

3. **Your Employment Data** (Complete as many items as you can)

   Date Hired: **09/9/96**     Job Title At Hire: **Ware House unloader**

   Pay Rate When Hired: **8.25**     Last or Current Pay Rate: **17,60**

   Job Title at Time of Alleged Discrimination: **Spotter**

   Name and Title of Immediate Supervisor: **Kris Knauth**

   **IF Applicant, Date You Applied for Job** _____ **Job Title Applied For** _____

4. **What is the reason (basis) for your claim of employment discrimination?**

   *FOR EXAMPLE, if you are over the age of 40 and feel you were treated worse than younger employees or you have other evidence of discrimination, you should check (✓) AGE. If you feel that you were treated worse than those not of your race or you have other evidence of discrimination, you should check (✓) RACE. If you feel the adverse treatment was due to multiple reasons, such as your sex, religion and national origin, you should check all three. If you complained about discrimination, participated in someone else's complaint or if you filed a charge of discrimination and a negative action was threatened or taken, you should check (✓) RETALIATION.*

   Race ☐  Sex ☐  Age ☐  Disability ☒  National Origin ☐  Color ☐  Religion ☐  Retaliation ☐  Pregnancy ☐

   Other reason (basis) for discrimination (Explain) _____

5. **What happened to you that you believe was discriminatory?** <u>Include the date(s) of harm, action(s) and include the name(s) and title(s) of the persons who you believe discriminated against you.</u> (Example: 10/02/06 – Written Warning from Supervisor, Mr. John Soto)

   A) Date: **12/16/05**   Action: **Fired**

   _____

   Name and Title of Person(s) Responsible: **Robin Batka**

   B) Date: **12/16/05**   Action: **Fired**

   _____

   Name and Title of Person(s) Responsible **Robin Batka**

   Describe any other actions you believe were discriminatory.

   **they kept dening it was a work injury and when they told me they Didn't have any work for me because of the plate in my neck,**

   _____
   _____
   _____

**(Attach additional pages if needed to complete your response.)**

Sears - 000503

6. What reason(s) were given to you for the acts you consider discriminatory?  By whom?  Title?

_See letter_

7. Name and describe others who were in the same situation as you.  Explain any similar or different   treatment.  Who was treated worse, who was treated better, and who was treated the same?  Provide race, sex, age, national origin, religion, and/or disability status of comparator if known and if connected with your claim of discrimination.  Add additional sheets if needed.

Full Name                          Job Title         _N/A_              Description
1._____
2._____
3._____

Answer questions 8-10 only if you are claiming discrimination based on disability.  If not, skip to question 11.

8. Please check all that apply:        ☐    Yes, I have an actual disability
                                        ☒    I have had an actual disability in the past    _Due to injury on job_
                                        ☐    No disability but the organization treats me as if I am disabled

9. If you are alleging discrimination because of your disability, __what is the name of your disability?__  How does your disability affect your daily life or work activities, e.g., what does your disability prevent or limit you from doing, if anything?  (Example:  lifting, sleeping normally, breathing normally, pulling, walking, climbing, caring for yourself, working, etc.):

_hernitated Discs      Neck injury, No limitations_
_but Sears thought I couldn't do my original job._

10. Did you ask your employer for any assistance or change in working condition because of your disability?
    YES ☐  NO ☒

   Did you need this assistance or change in working condition in order to do your job?
    YES ☐  NO ☒

   If "YES", when? _____To whom did you make the request?  Provide full name of person_____How did you ask (verbally or in writing)? _____
   Describe the assistance or change in working condition requested?
   _____
   _____
   _____

Sears - 000504

11. **Are there any witnesses to the alleged discriminatory incidents? If yes, please identify them below and indicate what they will say. Add additional pages if necessary.**

      NAME           JOB TITLE          ADDRESS & PHONE NUMBER

A. _____

   _____

      NAME            JOB TITLE          ADDRESS & PHONE NUMBER

B. _____

   _____

      NAME            JOB TITLE          ADDRESS & PHONE NUMBER

C. _____

   _____

12. **Have you filed a charge previously in this matter with EEOC or another agency? YES ☐   NO ☒**

13. **If you have filed a complaint with another agency, provide name of agency and date of filing:**

_____

14. **Have you sought help about this situation from a union, an attorney, or any other source?**
   **YES ☒   NO ☐   - If yes, from whom and when? Provide name of organization, name of person you spoke with and date of contact. Results, if any?**

   I spoke with attorney Micheal Dietchweiler on Dec. 20, 2006 he said to contact EEOC and get a letter of Right to Sue and he would like to take this case. If you EEOC Didn't

   Jo Coats Agent            1/5/07
   **Signature**                       **Today's Date**

**If you have not heard from an EEOC office within 30 days of mailing this form, please call toll-free number shown on the letter accompanying this form. Provide the tracking number on the attached cover letter. Please make a copy of this form for your records before mailing.**

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the uses thereof are:

1. FORM NUMBER/TITLE/DATE. EEOC Intake Questionnaire (10/2006).

2. AUTHORITY. 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626. 42 U.S.C. 12117(a)

3. PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information in an acceptable form consistent with statutory requirements to enable the Commission to act on matters within its jurisdiction. When this form constitutes the only timely written statement of allegations of employment discrimination, the Commission will, consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(b), consider it to be a sufficient charge of discrimination under the relevant statute(s).

4. ROUTINE USES. Information provided on this form will be used by Commission employees to determine the existence of facts relevant to a decision as to whether the Commission has jurisdiction over allegations of employment discrimination and to provide such charge filing counseling as is appropriate. Information provided on this form may be disclosed to other State, local and federal agencies as may be appropriate or necessary to carrying out the Commission's functions. Information may also be disclosed to respondents in connection with litigation.

5. WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. The providing of this information is voluntary but the failure to do so may hamper the Commission's investigation of a charge of discrimination. It is not mandatory that this form be used to provide the requested information.

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 440-2007-02414 |
| | | and EEOC |

State or local Agency, if any

| Name *(indicate Mr., Ms., Mrs.)*<br>**Ms. Jo A. Coats** | Home Phone *(Incl. Area Code)*<br>**(815) 468-9899** | Date of Birth<br>**11-24-1962** |
|---|---|---|

Street Address
**350 N. Birch, Apt 4, Manteno, IL 60950**

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>**SEARS LOGISTIS SERVICE** | No. Employees, Members<br>**Unknown** | Phone No. *(Include Area Code)*<br>**(815) 468-2152** |
|---|---|---|

Street Address
**1600 Bouderau Rd, Manteno, IL 60950**

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|

Street Address

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☐ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ OTHER *(Specify below.)*

| DATE(S) DISCRIMINATION TOOK PLACE |
|---|
| Earliest: **12-16-2005**  Latest: **12-16-2005** |
| ☐ CONTINUING ACTION |

PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began my employment with Respondent on or about September 9, 1998 and my most recent position was Spotter. On or about January 3, 2005, Respondent was made aware of my disability. I requested a reasonable accommodation from the Respondent on or about December 16, 2005. My reasonable accommodation request was denied and on or about December 16, 2005 I was discharged.

I believe that I have been discriminated against because of my disability, in violation of the Americans with Disabilities Act of 1990.

RECEIVED EEOC

JAN 2 5 2007

CHICAGO DISTRICT OFC

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| *1/20/07*<br>Date    X *Jo A Coats Agent*<br>Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

Sears - 000497

AGENT  Dep. Ex. **22** ID
Barbara J. Polke, CSR 1/10/08

E-FILED
Friday, 29 February, 2008  03:19:56 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION

Jo Ann Agent, f/k/a Jo Ann Coats,

        Plaintiff,

    v.

Sears Logistics Services, Inc.,

        Defendant.

No. 07-2113

Judge McCuskey
Magistrate Judge Bernthal

*Removed from the Kankakee County Circuit Court, Illinois 21st Judicial Circuit, Case No. 07-L-51*

## DECLARATION OF ROBIN BATKA

1.    I Robin Batka, am Sears' Human Resource Manager at the Manteno warehouse facility.

2.    I have two Human Resources Assistants working for me, Linda Carpenter and Erica Schwanbeck.

3.    The Manteno facility warehouses and provides logistics services for Sears retail stores.

4.    As a logistics service provider for Sears retail stores, the business of the Manteno facility is seasonal in that the retail stores "stock up" for the peak holiday season.

5.    As a result of this seasonal cycle, the Manteno facility hires dozens of additional seasonal employees beginning in September of each year, and lays off most of these employees by mid-December of each year.

6.    Between September and November of 2005, the facility had hired approximately 40 additional seasonal employees.

7.    The last seasonal employee to begin work in 2005, Alex Snodsmith (a college student working over his winter break), had been hired in November of 2005.

8.    His seasonal employment ended on January 13, 2006.

9.    By December of 2005, the facility had begun to lay off these additional employees.

10.    By December 15, 2005, there were absolutely no open positions in the facility.

11.    From December 15 to December 31, 2005, the facility laid off at least 25 employees.

12.    On December 16, 2005, I received a doctor's note that Ms. Jo Ann Agent had brought into the office the previous day, when I was out of the office.

13.    This doctor's note released Ms. Agent to work. However, as explained above, there were no open positions, and we were in the process of laying off employees.

14.    Since Ms. Agent had returned from leave, and there were no open positions, I sent her a letter informing her that she would be taken off the role, effective immediately.

15.    Just a few days later, and without knowing that Ms. Agent's employment had terminated, the Sears Employee Service Center in Tucker, Georgia sent out an automatic notification that Ms. Agent's employment would be terminated on January 20, 2006 if she did not return from leave by that time.

16.    I was unaware of this notification from the Sears Employee Service Center, which went out after Ms. Agent's employment had been terminated.

17.    Ms. Agent's termination had nothing to do with her filing a workers' compensation claim.

18.    Ms. Agent's termination had nothing to do with her alleged disability. I did not consider Ms. Agent to be disabled at any time.

I, Robin Batka, verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 26 day of February, 2008.

Robin Batka

E-FILED
Friday, 29 February, 2008  03:21:18 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT D

# Wolfe, Elfenbaum, Evers & Amarilio, P.C.

ATTORNEYS AND COUNSELORS

Dino Pigoni Labor Center  •  940 West Adams St.  •  Suite 300  •  Chicago, Illinois 60607
www.ilcomplaw.com

**JOSEPH D. AMARILIO**
ext 9104
jda@ilcomplaw.com

**IAN ELFENBAUM**
ext 9101
ianelf@ilcomplaw.com

**MICHAEL J. EVERS**
ext 9102
mevers@ilcomplaw.com

**KAREN HAARSGAARD**
ext 9106
karenh@ilcomplaw.com

**KENNETH B. WOLFE, JR.**
ext 9103
kwolfe@ilcomplaw.com

Phone
(312) 226-2650

Español
(312) 226-2812

General fax
(312) 226-2651

May 18, 2005

Human Resources Director
or Risk Manager
Sears Logistic Svc.
1600 Boudreau Rd.
Manteno, IL 60950

RE: Jo Ann Coats v. Sears Logistic Svc.
I.C.#: 05WC 21931

Dear Sir or Madame:

Enclosed is an Application for Adjustment of Claim, properly filed with Illinois Industrial Commission in connection with the above-captioned case[s]. **Please immediately forward a copy to your Workers' Compensation insurance carrier** to avoid a claims-coverage dispute with your own insurance company.

To promote the rapid disposition of this case, please promptly provide us with the following information:

1. A copy of all of the Petitioner's medical records in your possession. 50 Ill. Ad. Code 7710.10.

2. All incident or accident reports or witness statements filed by or for the Petitioner at any time during their employment.

3. A weekly wage statement showing all wages paid and hours worked, including overtime, for the 52 weeks preceding 1/2/2005. 820 ILCS 305/10.

4. An explanation for non-payment or termination of any TTD or medical benefits payable under the Act to which my client is or was entitled. 50 Ill. Adm. Code 7710.10.

5. If my client is off work or in need of medical care, demand is hereby made for you to provide such income protection and medical benefits as provided by law in 820 ILCS 305/8.

Your cooperation with this request will greatly expedite this matter and minimize your legal expenses.

Very Truly Yours,

WOLFE, ELFENBAUM & EVERS, P.C.

Ian Elfenbaum
IE/ag

*South Side Office*
*(not for mail)*
*USWA Local 5544*
*9350 South Chicago Ave.*

**Sears – 000319**

## ILLINOIS WORKERS' COMPENSATION COMMISSION
## APPLICATION FOR ADJUSTMENT OF CLAIM  (APPLICATION FOR BENEFITS)

ATTENTION. Please type or print. Answer all questions. File three copies of this form.

**MAY 2 3 2005**

Workers' Compensation Act **X** Occupational Diseases Act ____    Fatal case? No **X** Yes ____ Date of death _____

**Jo Ann Coats**    **MAY 16 2005**    Case # _____
Employee/Petitioner    (Office use only)

v.

**05WC 21931 IL**

**Sears Logistic Svc.**    Location of accident **Manteno** ____ **IL**
Employer/Respondent    or last exposure    City    State

**Jo Ann Coats**    **239 S. Poplar**    **Manteno**    **IL**    **60950**
Injured employee's name[1]    Street address    City    State    Zip code

**Sears Logistic Svc.**    **1600 Boudreau Rd.**    **Manteno**    **IL**    **60950**
Employer's name    Street address    City    State    Zip code

Employee information: Social Security # _____    Male ____ Female ____    Married ____ Single **X**

# Dependents under age 18 **02** ____    Birthdate _____    Average weekly wage $ **704.00**

Date of accident[2] **1/2/2005** ____    The employer was notified of the accident orally ____ in writing ____.

How did the accident occur? **petitioner injured while working** _____

What part of the body was affected? **woman as a whole** _____

What is the nature of the injury? **to be shown** ____    Return-to-work date[3] _____

Is a *Petition for an Immediate Hearing* attached? Yes ____    No **X**

Is the injured employee currently receiving temporary total disability benefits? Yes ____    No ____

If a prior application was ever filed for this employee, list the case number and its status _____

ATTENTION, PETITIONER. This is a legal document. Be sure all blanks are completed correctly and you understand the statements before you sign this. Refer to the Commission's *Handbook on Workers' Compensation and Occupational Diseases*[4] for more information.

*Jo ann Coats /DF*    **MAY 1 2 2005**
Signature of petitioner    Date

### APPEARANCE OF PETITIONER'S ATTORNEY
Please attach a copy of the *Attorney Representation Agreement*.

*Ian Elfenbaum*    **940 West Adams, Suite 300**
Signature of attorney    Street address

**Ian Elfenbaum        307**    **Chicago**    **IL**    **60607**
Attorney's name and IIC attorney code number    (please print)    City    State    Zip code
[5]

**Wolfe, Elfenbaum, Evers & Amarilio,**    **(312) 226-2650  ianelf@ilcomplaw.com**
Firm name    Telephone number    E-Mail Address

ICI 12/04   100 W. Randolph Street #8-200 Chicago, IL 60601 312/814-6611    Toll-free 866/352-3033    Web site: www.iwcc.il.gov Downstate offices:
Collinsville 618/346-3450   Peoria 309/671-3019   Rockford 815/987-7292   Springfield 217/785-7084
Disclosure of this information to the Commission is done voluntarily under 820 ILCS 305/6(b).

**Sears – 000320**

# PROOF OF SERVICE

If the person who signed the *Proof of Service* is not an attorney, this form must be notarized.
If you prefer, you may submit the front of this application form with the *Proof of Service* on a separate page.

I, Ian Elfenbaum _____, affirm that I _____ delivered

__x__ mailed with proper postage in the city of Chicago _____ a copy of this form at

5:30 _____ AM/PM on 5/12/2005 _____ to the respondent listed on this application and to each additional

party, if any, at the address listed below.

Sears Logistic Svc., 1600 Boudreau Rd., Manteno, IL 60950

Signature of person completing *Proof of Service*

Signed and sworn to before me _____/_____/_____

_____
Notary Public

---

[1] In most cases, the injured employee files this application and is referred to as the petitioner. If the injury was fatal, or if the worker is a minor or incapacitated, another person (as allowed by law) may file. In those cases, the person filing the application is the petitioner, and the worker is referred to as the injured employee. Please complete information related to age, etc., for the injured employee.

[2] This may be the date of the accident, last exposure, disability, or death.

[3] If the employee has not returned to work, leave this space blank.

[4] The Industrial Commission publishes a handbook that explains the workers' compensation system. If you would like a copy, please call any of the Commission offices listed on the other side of this form.

[5] The Industrial Commission assigns code numbers to attorneys who regularly practice before it. To obtain or look up a code number, contact the Information Unit in Chicago or any of the downstate offices at the telephone numbers listed on this form.

IC1 page 2

Sears – 000321

ILLINOIS WORKERS' COMPENSATION COMMISSION (IWCC)
100 WEST RANDOLPH STREET, SUITE 8-200, CHICAGO, IL 60601

MAY 2 5 2005

WWW.IWCC.IL.GOV
(312) 814-6500    TDD (312) 814-2959    TOLL FREE (866) 352-3033

MAIL TO:

SEARS LOGISTIC SVC
1600 BOUDREAU RD
MANTENO        IL  60950

IMPORTANT-NOTICE TO EMPLOYER/CARRIER
THIS IS A LEGAL DOCUMENT WHICH MUST
BE IMMEDIATELY SENT TO YOUR CARRIER
OR ATTORNEY.  FAILURE TO RESPOND MAY
RESULT IN A JUDGMENT BEING ENTERED
AGAINST YOU.

### NOTICE OF HEARING

ASSIGNED TO ARBITRATOR: DOLLISON, GREGORY

| PETITIONER: | NOTICE DATE | CASE FILED | CASE NUMBER |
|---|---|---|---|
| COATS, JO ANN | 05/18/2005 | 05/16/2005 | 05 WC 021931 |

PETITIONERS ATTORNEY:          SSN #    ACCIDENT DATE ACCIDENT LOC
WOLFE, ELFENBAUM & EVERS                01/02/2005 MANTENO          IL
INJURED EMPLOYEE:

RESPONDENT:                    ATTORNEY:
SEARS LOGISTIC SVC
1600 BOUDREAU RD
MANTENO        IL  60950

| HEARING TYPE: | DATE: | 07/06/2005 | STATUS CALL LOCATION: |
|---|---|---|---|
| | | | CITY COUNCIL CHAMBERS |
| | | | 385 EAST OAK STREET |
| | | | KANKAKEE        IL  60901 |
| INITIAL STATUS | TIME: | 9:00AM | |

COMPANION CASES:

FURTHER TAKE NOTICE THAT THE ABOVE ENTITLED CAUSE IS SCHEDULED FOR A
STATUS HEARING BEFORE THE WORKERS' COMPENSATION COMMISSION AS STATED
ABOVE AT WHICH TIME ALL PARTIES OR THEIR COUNSEL MUST APPEAR.
REQUEST FOR REASONABLE ACCOMMODATION UNDER TITLE II OF THE AMERICANS WITH
DISABILITIES ACT OF 1990 MUST BE MADE TO: ADA COORDINATOR, 100 W. RANDOLPH,
CHICAGO, IL, 60601 AT LEAST 20 DAYS PRIOR TO HEARING DATE.
IMPORTANT INFORMATION:
EFFECTIVE JAN 1, 2005 THE ILLINOIS INDUSTRIAL COMMISSION HAS CHANGED
ITS NAME TO THE ILLINOIS WORKERS COMPENSATION COMMISSION.

UNLESS A CASE IS TRIED, SETTLED OR DISMISSED IT WILL BE CONTINUED FOR
ANOTHER STATUS CALL IN TWO MONTHS.
(IC-2, REV.02/2005)